**Maryann BUDNICKI et al.**

v.

**Frank S. BEAL et al.**

**Civ. A. No. 77–3679.**

United States District Court, E. D. Pennsylvania.

April 25, 1978.

On Motion to Alter or Amend June 6, 1978.

R. Michael Kemler, Community Legal Services, Inc., Philadelphia, Pa., for plaintiffs.

Stanley I. Slipakoff, Asst. Atty. Gen., Michael von Moschzisker, Deputy Atty. Gen., Eastern Regional Director, Robert P. Kane, Atty. Gen., Stanley I. Slipakoff, Philadelphia, Pa., for defendants.

## ADJUDICATION

JOSEPH S. LORD, III, Chief Judge.

This class action challenges a reduction in the availability of orthopedic shoes and shoe accessories under the Pennsylvania Medical Assistance Program. Plaintiffs seek to enjoin the elimination of these benefits on the grounds that the cutbacks violate federal statutory and regulatory requirements under the Medical Assistance Program ("Medicaid"), 42 U.S.C. § 1396 *et seq.*, and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. A final hearing was held on the request for an injunction, from which I make the following findings and conclusions.

## I. FINDINGS OF FACT.

1. Pennsylvania has elected to participate in the Medicaid program, 42 U.S.C. § 1396 *et seq.*, which provides medical assistance to low income people under a state and federal cost-sharing system.

2. Before April 9, 1977, the Pennsylvania Medical Assistance ("MA") program provided to only categorically needy recipients, *i. e.*, individuals receiving cash assistance under one of the federally aided public welfare programs, "orthopedic shoes, braces and repairs to braces" as well as "shoe accessories (anterior laces, arch supports, foot pads, heel elevations, metatarsal pads) and orthopedic corrections to shoes." *Pa. DPW–PA Manual* §§ 9411.434 and 9413 Appendix I.

3. On April 9, 1977, by publication in 7 *Pennsylvania Bulletin* 1002 (April 9, 1977), the Department of Public Welfare ("DPW") adopted a regulation, § 9435.431, significantly limiting the availability of orthopedic shoes and shoe accessories. Section 9435.431 took effect April 15, 1977, and provided in part:

"The Department will pay for custom-made molded and orthopedic shoes under the following conditions:

A. Custom-made molded shoes when prescribed for severe foot and ankle conditions and deformities resulting from congenital or acquired trauma or peripheral vascular or neuropathic disorders. The severity of the foot condition or deformity must be of sufficient degree that the patient is unable to wear ordinary sturdy shoes with or without corrections and modifications.

B. Orthopedic shoes when prescribed as an attachment to a leg brace. When orthopedic shoes are attached to a leg brace, the Department will pay for the necessary corrections to these shoes, such as arch supports, spur pads or metatarsal insoles as described in the fee schedule.

Except for A and B above, payment will *not* be made for space or molded shoes, orthopedic shoes or corrections to these shoes whether or not they are prescribed by a practitioner."

4. Plaintiffs are categorically needy MA recipients in need of orthopedic shoes or shoe accessories and an unincorporated association which includes members who are such MA recipients. Defendants are state officials responsible for administering the MA program.

5. The reason given by defendants for the reduction in the orthopedic shoe program was that MA officials concluded there was "gross misutilization" of the program, including fraud by MA recipients, podiatrists and shoe stores. In particular, podiatrists were prescribing orthopedic shoes to MA recipients who had no medical need for these shoes and stores were selling recipients ordinary shoes but charging the MA program for more expensive orthopedic shoes. DPW officials maintain that because the state was unable to require prior authorization before the recipient could purchase these shoes, DPW officials could not exert the necessary controls to halt these misuses. Prior authorization was not permitted under the terms of a consent decree entered into by the state in *Turner*

*v. Beal*, Civil Action No. 74–1680 (E.D.Pa. 1975).

The overutilization of the program is demonstrated by the fact that in fiscal year 1976, when the MA program had a requirement of prior authorization, all medical supplies and equipment, including orthopedic shoes, cost $809,000. In the next year, when there was no such requirement, these same items cost $2.8 million, with $2.4 million expended for orthopedic shoes. The abuse was most apparent in Philadelphia County where in fiscal year 1977 $2.1 million was spent on orthopedic shoes. Although there have been some investigations of particular cases of abuse, civil suits for reimbursements and criminal prosecutions,. these actions did not eliminate the abuse. DPW did not implement, however, other controls suggested in an internal memorandum by DPW employee John Kauker and in a Department of Health, Education and Welfare ("HEW") memorandum of November 7, 1977. The expenditure for orthopedic shoes in fiscal year 1977 placed a substantial burden on the state's MA finances.

6. DPW did not send any notice of the reduction in the orthopedic shoe program to any MA recipients.

7. Pursuant to federal regulations, Pennsylvania has established a Medical Assistance Advisory Council ("Council") which is intended, *inter alia*, to "give professional advice to the Office of Medical Programs on the development of sound policies and standards of medical assistance." *Pa. DPW–OMP–MA Manual* § 9100 Part IV B. Before the April 9, 1977, modification, the Council was neither adequately advised of the proposed change in the availability of orthopedic shoes nor given an adequate opportunity to participate in that decision. However, since the hearing in this case, Council has been notified of the reduction through notice sent to each Council member on January 6, 1978. A meeting of Council was held on January 19, 1978, in which the orthopedic shoe program was discussed extensively. As a result of that discussion Council unanimously accepted a recommendation to be presented to the Chief Admin-

istrator of the MA program concerning the orthopedic shoe reduction.

8. MA recipients have suffered and will continue to suffer serious harm as a result of the reduction in the availability of orthopedic shoes. If some recipients are not supplied with orthopedic shoes, they will experience severe pain and can become nonambulatory. Additionally, orthopedic shoes for children can correct abnormalities which otherwise might become permanent disabilities without such medical intervention. The cost of orthopedic shoes is high, approximately $40–50 per pair, and the shoes generally must be replaced every six months to one year.

## II. DISCUSSION.

Plaintiffs object to the reduction in the availability of orthopedic shoes on four grounds: (1) defendants have violated federal statutes and regulations in reducing the orthopedic shoe program without timely and adequate notice and without affording plaintiffs an opportunity for a hearing before the reduction; (2) defendants' conduct also violates the Due Process Clause of the Fourteenth Amendment because the reduction was effected without notice and an opportunity for a hearing; (3) defendants have violated federal statutory and regulatory provisions by failing, before the reduction, to consult with the Medical Assistance Advisory Council and to allow the Council an "adequate opportunity for meaningful participation" in the decision to reduce the program; and (4) defendants have violated 42 U.S.C. § 1396a(a)(19) by failing to act in the recipients' "best interests" in that they reduced the program before adequately pursuing alternative means to halt overutilization of services which would not entail a change in program benefits. Each of these arguments will be addressed in turn.

*A. Statutory Requirement of Notice and Hearing Before Reduction of Benefits:*

Pennsylvania, as a participant in the Medicaid program, must conform its MA program to the requirements of Title XIX

of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, and all the regulations promulgated thereunder. *Feld v. Berger*, 424 F.Supp. 1356, 1360 (S.D.N.Y.1976). *See generally Shea v. Vialpando*, 416 U.S. 251, 253, 94 S.Ct. 1746, 40 L.Ed.2d 120 (1974); *King v. Smith*, 392 U.S. 309, 317, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). Title XIX requires that a state plan provide six general categories of medical services to "categorically needy" individuals, *i. e.*, all individuals receiving cash assistance under one of the federally-aided public welfare programs, 42 U.S.C. § 1396a(a)(10)(A).[1] In addition, a state may elect to make available to program recipients optional medical services such as prosthetic devices, dental services and medical supplies, equipment and appliances. Before April 9, 1977, Pennsylvania provided prosthetic devices, including orthopedic shoes, to only categorically needy recipients.

### 1. Notice.

In administering its program, a state is bound to comply with the procedural requirements promulgated under Title XIX. In particular, the state must give all eligible recipients timely and adequate notice when it intends "to discontinue, terminate, suspend or reduce assistance." 45 C.F.R. § 205.10(a)(4). It is obvious that the action taken here reduced the assistance available to MA recipients. Defendants argue, however, that publication in the *Pennsylvania Bulletin* served as adequate and timely notice and that it was impossible to notify individually all affected MA recipients because the state could not identify those MA recipients who would be in need of orthopedic shoes in the future. They also assert that individual notice now to MA recipients would serve no further function since the recipients do not have a right to a hearing and are currently in court testing the reduction.

Defendants' argument ignores the essential function of § 205.10(a)(4), namely to give all MA recipients an opportunity to adjust by having notice of a program change before any alteration is effectuated. This right exists independently of any right to a hearing, as the Third Circuit held in *Rochester v. Baganz*, 479 F.2d 603 (3d Cir. 1973), after analyzing a previous version of this regulation in connection with another federally funded program:

> "The regulation permits termination or reduction in such cases without a prior fair hearing, but only after fifteen days notice. The Secretary urges that even in cases of across-the-board reductions such advance notice is necessary, or at least appropriate, for the orderly administration of welfare programs. He urges that in a program designed to meet subsistence needs recipients ought to be informed in advance if their payments are to be cut for any reason, so that they may be able to plan for the cut, and to the extent possible adjust to it. We agree that it was well within the range of the Secretary's rulemaking authority to insist, as a condition for state participation in the AFDC program, that each state manage its fiscal affairs so as to be able to provide at least this minimum advance warning to beneficiaries about to be deprived of benefits upon which they may have been counting heavily." *Id.* at 606–07.

Several courts have required, pursuant to § 205.10(a)(4), that timely and adequate notice be given when across-the-board reductions in state Medicaid program have been instituted, such as the one involved here. *See, e. g., Becker v. Toia*, 439 F.Supp. 324, 330–31 (S.D.N.Y.1977); *Turner v. Walsh*, 435 F.Supp. 707, 714–16 (W.D.Mo. 1977); *Benton v. Rhodes*, Civ. Action No. 76–263 at pp. 3–8 (S.D.Ohio May 11, 1976). I agree with these decisions and conclude that individual notice to all categorically needy MA recipients is necessary before

---

1. The state may also elect to cover in its Medicaid program individuals who do not receive cash assistance. These recipients are termed "medically needy" individuals. 42 U.S.C. § 1396a(a)(10)(C); 45 C.F.R. § 248.1(a)(2). Pennsylvania has elected to include "medically needy" individuals in its MA program but did not cover them in the orthopedic shoe program.

this reduction can be implemented. The defendants must send this notice to each categorically needy recipient since each had the right to receive such benefit before the change was effectuated.

The requirement of "timely" notice for any such change is defined by § 205.-10(a)(4)(i)(A), which states that notice must be mailed ten days before the date of action. On the other hand, the meaning of "adequate" notice varies according to whether the program change is classified as "automatic grant adjustments for classes of recipients" due to "changes in either State or Federal law." 45 C.F.R. § 205.-10(a)(4)(iii). If it is, the regulation specifies:

> "[T]imely notice of such grant adjustment shall be given which shall be 'adequate' if it includes a statement of the intended action, the reasons for such intended action, a statement of the specific change in law requiring such action and a statement of the circumstances under which a hearing may be obtained and assistance continued." *Id.*

Since the classification of this reduction as an "automatic grant adjustment" *vel non* has important consequences on the issue of pre-termination hearing as well as notice, this classification must be critically analyzed. It must be noted that § 205.10 resulted from the Supreme Court's decision in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), and specifies procedures to be followed in several federally funded programs in addition to Medicaid. Consequently, the language is better suited to cash assistance programs than to the Medicaid program and thus, in the latter context, the regulation's terms cannot be strictly construed.

 In order to apply § 205.10(a)(4)(iii) to a program alteration, three conditions must be met: (1) the change must be required by state or federal law; (2) it must affect a group of recipients and (3) it must be "automatic" for that group of recipients. The first element is met if the program

alteration results from statutory or regulatory modifications of a state plan. *See Kimble v. Solomon*, Civ. No. 76–210 at 10–13 (D.Md. Nov. 4, 1976). The latter is state law so long as the regulation is adopted pursuant to statutory authority, as was the regulation here, § 9435.431. *See* 7 *Pennsylvania Bulletin* 1002 (April 9, 1977) (action pursuant to 62 P.S. §§ 403, 443.4 and 451). I believe the next two conditions of § 205.-10(a)(4)(iii) are intended to assure that the alteration of benefits affects similarly a group of recipients and that there are no individualized factual questions which must be resolved in order to determine the regulation's applicability to a particular recipient, *i. e.*, that the alteration is "automatic" for that group of recipients. The reduction in the orthopedic shoe program satisfies both these conditions; generally all categorically needy recipients, regardless of their individual situation, are ineligible for orthopedic shoes under the MA program after the promulgation of regulation 9435.-431.

Plaintiffs argue that the reduction here is "action to discontinue, terminate, suspend or reduce assistance" rather than an "automatic grant adjustment." I believe this misconstrues the question in that it posits mutual exclusivity between these two classifications, whereas in fact the latter, automatic grant adjustment, is a sub-category of the former. I have concluded that the elimination of the orthopedic shoe program is both a reduction in benefits and an automatic reduction.

The cases cited by plaintiff, *Rochester v. Baganz*, 479 F.2d at 607; *Benton v. Rhodes, supra* at 7–8; *Brown v. Wohlgemuth*, 371 F.Supp. 1035, 1039 (W.D.Pa.), *aff'd*, 492 F.2d 1238 (3d Cir. 1974), for the proposition that this program alteration is not an automatic grant adjustment do not support that assertion. Rather, these decisions conclude that even an across-the-board change in a program may give rise to factual questions in the application of that change to individual recipients which would necessitate a hearing.[2] This is precisely what I have

---

2. The statement in *Benton* that the program reductions are not "automatic grant adjust- ments" is in reference only to those recipients who assert that the services affected by the

concluded. However, for those recipients who cannot mount a challenge on this basis, the program alteration is "automatic" and thus the state is bound by regulation only to provide notice of the change pursuant to 45 C.F.R. § 205.10(a)(4)(iii) for all categorically needy MA recipients.

### 2. Hearing.

Sub-sections 205.10(a)(5) and (6) specify when a hearing is required for recipients affected by a program change. The relevant part of regulation 205.10(a) states:

"(5) An opportunity for a hearing shall be granted . . . to any recipient who is aggrieved by any agency action resulting in suspension, reduction, discontinuation or termination of assistance. A hearing need not be granted when either State or Federal law require [sic] automatic grant adjustments for classes of recipients unless the reason for an individual appeal is incorrect grant computation.

(iv) Agencies may respond to a series of individual requests for hearings by conducting a single group hearing. Agencies may consolidate only cases in which the sole issue involved is one of State or Federal law or policy or changes in State or Federal law.

(v) The agency may deny or dismiss a request for a hearing . . . where the sole issue is one of State or Federal law requiring automatic grant adjustments for classes of recipients . . . .

(6) If the recipient requests a hearing within the timely notice period:

(i) Assistance shall not be suspended, reduced, discontinued or terminated . . .

until a decision is rendered after a hearing, unless:

(A) Determination is made at the hearing that the sole issue is one of State or Federal law or policy, or change in State or Federal law and not one of incorrect grant computation. . . ." (Emphasis added).

Although the regulation is not without some ambiguity,[3] I conclude that it does not require that all categorically needy recipients be afforded an opportunity for a hearing to object to the alteration of the orthopedic shoe program. However, the regulation does provide that recipients can request a hearing even in the case of an automatic grant adjustment if they claim "incorrect grant computation." Just as the term "automatic grant adjustment" must not be construed literally, so must "incorrect grant computation" be interpreted broadly. In the context of the Medicaid program, I conclude that a challenge of incorrect grant computation arises whenever a recipient claims the misapplication of the new regulation to his or her individual situation. So interpreted, section 205.-10(a)(5) requires that a pre-reduction hearing be provided for all recipients who assert that due to individualized factual questions the elimination of the orthopedic shoe program does not apply to them. See Benton v. Rhodes, supra at 7–8. For example, a recipient might argue that he or she is entitled to the service under some other element of the MA program such as the mandatory early screening program, 45 C.F.R. § 249.10(b)(4)(ii), or that the medical device being requested is not an orthopedic shoe but rather is a molded shoe or an

---

change in coverage are not optional services for that recipient. These recipients also have a right to a hearing under my interpretation of the regulation (see part II, A, 2 infra) and it is not material whether one classifies their objection as an "incorrect grant computation" or finds that the alteration is not an "automatic grant adjustment." I conclude the former is more consistent with the regulation's language since the characteristics of a program reduction should be judged in relation to all recipients and not on an individual basis when notice

of the change must be sent to all recipients describing the alteration.

3. The regulation provides that a group hearing may be held where there is solely a question of state or federal law while no hearing is required when there is an automatic grant adjustment required by state or federal law. I interpret this to mean that for the sub-category of changes in law resulting in an automatic grant adjustment, the group hearing provision does not apply.

orthopedic shoe attached to a brace to which the recipient has a right. In summary, recipients who maintained that because of the facts of their situation they are unaffected by or exempt from the proposed change in state law must be afforded an opportunity to challenge any denial of MA services.

■ On the other hand, MA recipients who challenge the reduction in the orthopedic shoe program on the basis that the change is invalid because of federal or state law or policy, do not fall into the category of recipients raising a claim of incorrect grant computation and thus they do not have a statutory right to a hearing under § 205.10(a)(5).

### B. Due Process Challenge:

Plaintiffs also assert that the denial of individual notice and hearing for all MA recipients violates the Due Process Clause of the Fourteenth Amendment. Since I have ruled that plaintiffs have a statutory right to notice, it is necessary to consider only the constitutional claim concerning plaintiffs' right to a hearing.

As defendants concede, the reduction in the orthopedic shoe program affects a property interest of plaintiffs sufficiently to invoke the proscriptions of the Due Process Clause. *Goldberg v. Kelly*, 397 U.S. at 262–63, 90 S.Ct. 1011. The issue, therefore, is what process by the state is due plaintiffs in order to accomplish this program reduction. Defendants argue that no administrative hearing is necessary for any MA recipients, while plaintiffs assert that each individual is entitled to a pre-termination hearing. I conclude that some, but not necessarily all, MA recipients have a right to a pre-termination hearing.

*Goldberg* is the touchstone for analyzing the constitutional requirement of a hearing before termination or reduction of a state funded program. However, *Goldberg* addressed only the issue of whether such a process is required "where recipients have challenged proposed terminations as resting *on incorrect or misleading factual premises or on misapplication of rules or policies to*

*the facts of particular cases."* 397 U.S. at 268, 90 S.Ct. at 1020 (emphasis added). The Court explicitly declined to rule upon the process necessary when "there are no factual issues in dispute or where the application of the rule of law is not intertwined with factual issues." *Id.* at 268 n.15, 90 S.Ct. at 1020. To determine whether a hearing is required for MA recipients it is necessary to decide: (1) if some MA recipients requesting a hearing could raise factual questions or the misapplication of regulation 9435.431 to their individual situation and if so, what process is necessary for such recipients and (2) if some recipients can challenge the termination solely on the grounds of state or federal law and if so, what process is due them.

Defendants assert that any challenge to this across-the-board alteration of the MA program would involve solely a question of state or federal law for all recipients and that any evidentiary hearing for an individual recipient would be superfluous. I reject this assertion.

■ I conclude there may be MA recipients who could claim that shoes requested by them are not excluded by regulation 9435.431 (*e. g.*, they request molded shoes or orthopedic shoes attached to a brace) and who thus could raise a factual question which is not applicable to all MA recipients. Additionally, there may be MA recipients who could assert that the state is required to supply them orthopedic shoes under another provision of the MA program and thus that their request for medical supplies does not fall within an optional service in the MA program. These recipients in effect would be raising the misapplication of the regulation to their situation and thus would satisfy the second *Goldberg* criterion for requiring pre-termination hearings. I agree with those courts which have found that an individual hearing is necessary even when there is an across-the-board change in a state program as a result of state or federal law so long as a program recipient might have individual questions to raise. *See, e. g., Mothers' & Children's Rights*

*Organization v. Sterrett*, 467 F.2d 797 (7th Cir. 1972); *Hurley v. Toia*, 432 F.Supp. 1170 (S.D.N.Y.1977); *Viverito v. Smith*, 421 F.Supp. 1305 (S.D.N.Y.1976); *Cardinale v. Mathews*, 399 F.Supp. 1163 (D.D.C.1975).

■ Defendants argue, however, that *Goldberg* has been severely restricted by *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). There the Court held that a pre-termination hearing was not necessary before Social Security disability benefits were halted and that the administrative procedures provided by the state were constitutionally sufficient. This decision was arrived at after balancing three factors: (1) the private interest of the recipient; (2) the risk of erroneous deprivation of such interest and the probable value, if any, of additional procedural safeguards; and (3) the government's interests. *Id.* at 335, 96 S.Ct. 893. I conclude that the *Mathews* analysis supports my decision to require a pre-termination hearing in this case because the state provides no administrative procedure to review a decision to deny these medical services, and because the state asserts that no hearing is required either before or after the program alteration is effectuated. Obviously the current state procedures are inadequate to correct any error which would result from the misapplication of regulation 9435.431 to a particular recipient; the constitutional requirement of an opportunity to be heard cannot be avoided by nonexistent alternative state procedures.

However, most MA recipients who may desire to challenge the reduction in the orthopedic shoe program could not raise factual questions or claim the misapplication of the regulation to their individual situation. Their request for a hearing could raise only questions of state or federal law or policy. I must determine whether the state must provide these individuals with evidentiary hearings before the reduction is effectuated, an issue not decided by the *Goldberg* decision.

Several courts have discussed whether the existence *vel non* of a due process right to a hearing turns on a determination that the issues to be resolved at that hearing will involve factual questions or solely questions of law or policy. This "fact/law" distinction in due process · consequences is analogous to the differentiation made in due process rights between acts by government agencies in their rulemaking as opposed to their adjudicatory function. As Professor Davis has explained, when agencies are required to determine adjudicative facts, *i. e.,* "facts about the parties and their activities, businesses, and properties," a trial-type hearing is required. *K. Davis, Administrative Law Treatise* § 7.02 at 413 (1958). In contrast, when agency action involves only consideration of legislative facts, *i. e.,* "general facts which help the tribunal decide questions of law and policy and discretion," an individual evidentiary hearing is not necessary. *Id.* at 413. This distinction has been held to be consistent with the Due Process Clause of the Fourteenth Amendment, *United States v. Florida East Coast R. Co.*, 410 U.S. 224, 244–45, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973), and has been applied in several cases involving public assistance programs in which a hearing request was rejected. *See, e. g., Russo v. Kirby*, 453 F.2d 548, 551–52 (2d Cir. 1971); *Kimble v. Solomon, supra* at 13–14; *Whitfield v. King*, 364 F.Supp. 1296, 1301–02 (M.D.Ala.1973) *aff'd mem.*, 431 U.S. 910, 97 S.Ct. 2166, 53 L.Ed.2d 221 (1977); *Rochester v. Ingram*, 337 F.Supp. 350, 355–57 (D.Del. 1972), *rev'd on other grounds sub nom. Rochester v. Baganz*, 479 F.2d 603 (3d Cir. 1973); *Provost v. Betit*, 326 F.Supp. 920, 922–24 (D.Vt.1971).

Other courts have found that the "fact/law" distinction should not justify a denial of a pre-termination hearing. *See, e. g., Mothers' & Children's Rights Organization v. Sterrett*, 467 F.2d at 800; *Schneider v. Whaley*, 417 F.Supp. 750, 757–58 (S.D.N.Y.), *modified*, 541 F.2d 916 (2d Cir. 1976); *Cardinale v. Mathews*, 399 F.Supp. at 1172; *Burlingame v. Schmidt*, 368 F.Supp. 429, 433 (E.D.Wis.1973); *Yee-Litt v. Richardson*, 353 F.Supp. 996, 1000 (N.D.Cal.), *aff'd sub nom. Carleson v. Yee-Litt*, 412 U.S. 924, 93 S.Ct. 2753, 37 L.Ed.2d 152 (1973). A careful review of these decisions discloses, however,

that the courts required a pre-termination hearing because either (1) the recipients demonstrated that there were factual questions involved in the resolution of the question of law or (2) the court concluded that a general regulation which exempted the hearing requirement when only policy questions arose was unworkable since there were inevitable mistakes made by the hearing officer in deciding when questions of fact or only policy would be involved in a recipient's request for a hearing. These decisions do not reject the validity of the "fact/law" distinction if correctly applied.[4]

■ Applying this doctrine to the reduction in the orthopedic shoe program, I conclude that for those recipients who cannot challenge the reduction on the basis of some factual question or the misapplication of the regulation to their particular situation, only legislative facts would be involved in any hearing request. Consequently, I find that there would be no benefit derived from individualized evidentiary hearings and therefore conclude that the state is not constitutionally required to provide hearings for these recipients.

### C. Failure to Consult Medical Assistance Advisory Council:

■ Plaintiffs challenge the manner in which regulation 9435.431 was adopted and implemented on the ground that MA officials failed to consult with the Medical Assistance Advisory Council as required by the Social Security Act, 42 U.S.C. § 1396a(a)(33)(A) and the federal regulations, 45 C.F.R. § 246.10(a)(1)–(3). I agree that a failure adequately to consult with the Council would necessitate the voiding of a promulgated regulation. *See, e. g., Becker v. Toia*, 429 F.Supp. at 331–33; *Benton v. Rhodes, supra* at 8. However, the discussion by the Council at its January 19, 1978, meeting demonstrates that Council adequately was notified and given an opportu-

nity to discuss the reduction in the orthopedic shoe program, and therefore this requirement has been satisfied.

### D. Failure to Administer The Program in the "Best Interests of the Recipients":

The last challenge of plaintiffs to the reduction in the orthopedic shoe program goes beyond an attack on the termination procedure and is concerned with the substantive decision to halt supplying some orthopedic shoes. Section 1396a(a)(19) provides that a state plan for medical assistance must include:

"[S]uch safeguards as may be necessary to assure that eligibility for care and services under the plan will be determined, and such care and services will be provided in a manner consistent with simplicity of administration and the *best interests of the recipients*." (Emphasis added).

Plaintiffs argue that the state has violated this provision in reducing the availability of orthopedic shoes rather than by using some other mechanism to attack the alleged fraudulent overuse of these services. In particular, plaintiffs assert that the state failed to initiate or intensify a "utilization review" program or to pursue criminal prosecutions in order to stop such overuse. Additionally, they argue that the state did not implement other mechanisms suggested in the memoranda by John Kauker and HEW to control the program. Defendants respond by asserting that the overutilization of these services could not be halted by such techniques and that the bar to prior authorization contained in the *Turner v. Beal* consent decree resulted in a system that could not be administered properly.

It is unclear to what extent § 1396a(a)(19) is applicable to a program change involving optional services. Those

---

4. In only one decision, *Mothers' & Children's Rights Organization v. Sterrett*, 467 F.2d at 800, did a court conclude that a hearing was necessary when there was only a question of law involved, and even in that decision the court did not require an evidentiary hearing. I

find the court's conclusion to be against the weight of authority and therefore decline to follow it to the extent that it recognizes a limited right to a hearing when no factual questions are raised.

cases which have applied the "best interests of recipients" standard have involved only mandatory services required to be in a state plan pursuant to 42 U.S.C. § 1396a(a)(13)(B). *Coe v. Hooker,* 406 F.Supp. 1072 (D.N.H.1976); *American Medical Association v. Weinberger,* 395 F.Supp. 515 (N.D.Ill.) *aff'd,* 522 F.2d 921 (7th Cir. 1975). In these cases it was clear that the state could not terminate the medical services and therefore the issue was whether those restrictions placed on the delivery of those services were done in the best interests of recipients. The language and legislative history of this section suggest that it is intended to ensure that the administration and delivery of existing medicaid services in a state plan are accomplished in a manner which is consistent with the best interests of recipients.

■ Optional categories of medical services, including orthopedic shoes, do not have to be part of a state plan, and states are not constitutionally or statutorily required to continue providing such services indefinitely. *Benton v. Rhodes, supra* at 3–4. The Social Security Act itself recognizes that the state has discretion to determine the extent to which it can provide medical services to indigent individuals. Section 1396 states that federal funds are available "[f]or the purpose of enabling each State, *as far as practicable under the conditions in such State,* to furnish (1) medical assistance" to low income individuals.

It would appear, therefore, that the statutory intent of Title XIX is to leave solely to the state the decision of the scope of its medical assistance program beyond that mandated by the Act. So interpreted, the term "best interests of the recipients" would not necessarily apply to a decision to curtail an existing program. On the other hand, one could argue that once the state has instituted an optional medical service, Medicaid recipients have a right to challenge any alteration of that program which is enacted without justification and which is not in the best interests of recipients.

■ But it is not necessary here to decide whether § 1396a(a)(19) can be used to halt a termination of an optional service because I find that if such constraint is applicable, the state has met its burden to administer the program in the "best interests of recipients". I believe that in applying the "best interests of recipients" standard in such a case, a court is constrained to decide only whether an alteration of a state's Medicaid program is rationally related to the best interests of recipients. In other words, any change which is not irrational or arbitrary and counterproductive to the medical well-being of all Medicaid recipients must be sustained. The court is not in a position to determine which medical services should be provided to poor people given limited state finances and how to optimize that system.

■ Applying this standard to the termination of the orthopedic shoe program, I find that the state's decision in this case must be sustained. It is undisputed that there was abuse of the orthopedic shoe program which was due in part to fraud by shoe stores, podiatrists and MA recipients. It is also clear that the state's resources are finite and that overuse in one aspect of the program can mean a reduction in other aspects of the MA program. I conclude that halting the orthopedic shoe program to conserve state MA funds, in light of this overutilization, is a rational and reasonable approach. Whether other mechanisms could have remedied the situation is unclear and does not refute the validity of the state's position.

*E. Remedy:*

Since I have found that the state has violated federal statutory and constitutional standards in the method in which it terminated the orthopedic shoe program, I conclude the only effective remedy is the reinstatement of the program. I realize, however, that the state may wish to terminate the program again in a manner consistent with constitutional and statutory requirements. If the state intends to do so it will have to comply with the following procedure: (1) notify all MA recipients that the

orthopedic shoe program has been reinstituted; (2) supply "timely" and "adequate" notice, pursuant to 45 C.F.R. § 205.-10(a)(4)(i)(A) and (iii), of the state's intention to reduce again the orthopedic shoe program; and (3) provide notice to each categorically needy MA recipient that he or she has a right to a pre-termination hearing to challenge a denial of orthopedic shoes if he or she asserts either that the regulation reducing the program does not apply to his or her specific request for a medical device or that supplying orthopedic shoes is not an optional service for that MA recipient.

### III. CONCLUSIONS OF LAW:

1. The court has jurisdiction to hear this action against the individual defendants, Frank S. Beal, Roger Cutt, Glenn Johnson and Don Jose Stoval, pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3) and (4).

2. Defendants' failure to provide timely and adequate notice to all categorically needy MA recipients violates federal law under 45 C.F.R. § 205.10(a)(4).

3. Defendants' failure to provide an opportunity for a pre-termination evidentiary hearing to MA recipients who assert either that medical supplies requested by them are not covered by the regulation reducing the orthopedic shoe program or that the state is required to provide orthopedic shoes under another provision of the MA program violates federal law pursuant to 45 C.F.R. § 205.10(a)(5) and the Due Process Clause of the Fourteenth Amendment.

4. Defendants have provided the Medical Assistance Advisory Council an adequate opportunity to participate in the decision to reduce the orthopedic shoe program.

5. Defendants' decision to terminate the orthopedic shoe program does not violate 42 U.S.C. § 1396a(a)(19), which requires the state to operate its Medicaid program in the "best interests of the recipients".

6. The state will be ordered to reinstate the orthopedic shoe program until such time as they comply with the federal constitutional and statutory requirements concerning alteration of medical assistance program.

### ON MOTION TO ALTER OR AMEND

Plaintiffs have filed a motion to alter or to amend the judgment of this court issued on April 25, 1978, in which I determined, *inter alia,* that defendants had not violated the Social Security Act, 42 U.S.C. § 1396a(a)(33)(A) and federal regulations, 45 CFR § 246.10(a)(1)–(3), *i.e,* that defendants had not failed adequately to consult with the Medical Assistance Advisory Council. Plaintiffs request that I alter that Adjudication by enjoining defendants from again suspending, discontinuing, terminating or reducing the orthopedic shoes program unless and until they again submit the matter to the Medical Assistance Advisory Council ("Council"). I will deny plaintiff's motion.

As I held in the Adjudication, a failure adequately to consult with the Council would necessitate the voiding of a promulgated regulation. Plaintiffs appropriately argue that such consultation must occur before state action is taken to alter a state Medicaid program. *See, e.g., Ho v. Chang,* CCH Medicare and Medicaid Guide ¶ 28,433 (D. Hawaii, April 27, 1977); *Becker v. Toia,* 439 F.Supp. 324, 332 (S.D.N.Y.1977). However, the meeting of Council on January 19, 1978, adequately met the federal requirements not because it was a post-reduction consultation with Council, but rather because defendants approached Council concerning what action the defendants should take if regulation 9435.431 was invalidated. Thus the January 19, 1978, meeting was in effect a prereduction consultation for future action. Since I concluded that regulation 9435.431 had to be invalidated for other reasons and that the defendants had complied with the consultation requirements for any future changes, I concluded that no violation existed at the time of the Adjudication. For the same reasons I now deny plaintiff's motion.