**SENIORS UNITED FOR ACTION;**
**et al., Plaintiffs,**

v.

**Robert RAY, Individually and in his official capacity as Governor of the State of Iowa, et al., Defendants.**

**No. C 80–4064.**

United States District Court,
N. D. Iowa, W. D.

June 30, 1981.

---

Carroll L. Lucht, Legal Services Corp., Des Moines, Iowa, for plaintiffs.

John G. Black, Sp. Asst. Atty. Gen., Des Moines, Iowa, for defendants.

## ORDER

O'BRIEN, District Judge.

## I. INTRODUCTION

This matter came before the Court for trial to the Court on March 18 and April 9, 1981. Proposed Findings of Fact and Conclusions of Law have been submitted to the Court by both parties. The Court deems this cause fully submitted.

## II. FINDINGS OF FACT

### A. *Background*

The present action was brought to enjoin the continuing operation of certain policy changes which were implemented in the state Medicaid program on July 1, 1980 by the Iowa Department of Social Services. The policy changes in question arose out of House File 2580, an act of the 68th General Assembly, which was passed by the Iowa House of Representatives on April 18, 1980, was passed by the Senate on April 24, 1980, was signed into law by the Governor on May 26, 1980, and went into effect on July 1, 1980. The specific provisions of House File 2580 which are relevant to this matter are contained in § 76 of the Act.[1]

1. Sec. 76. The department of social services shall adopt rules ... as follows:
. . . .
2. To eliminate payment for laxative drugs.
3. To limit orthodontia and posterior dental bridgework, except that assistance shall be available for injuries requiring emergency treatment.
4. To limit the types of eyeglass frames provided.
5. To extend the time period which must elapse before a person may obtain new eyeglasses, except that provision shall be made for emergency needs.
6. To provide that dentures shall be replaced no oftener than once every five years, except that allowance shall be made for emergency needs.
7. To provide reimbursement for hearing aids at factory cost plus a dispensing fee covering ear mold fitting and service for six months, and payment for batteries as requested by recipient.
8. To provide co-payment for the following optional services—dental, optometry, optical, audiology, orthopedic shoes, hearing aids and medical equipment.
9. To provide for a fifty cent drug co-payment . . . .
Laws of the Sixty Eighth G.A., 1980 Session 1, 26.

Through specifically authorized emergency rules, the cost-sharing plan was implemented on July 1, 1980. The Department of Social Services drafted rules concerning the cutbacks, which were adopted by the Council on Social Services on June 26, 1980. The rules became effective on June 30, 1980.

The present action challenging the legality of the implementation of the policy changes was initiated on July 8, 1980. A hearing on plaintiffs' motion for a preliminary injunction was held on July 30, 1980, final arguments of counsel were presented on August 12, 1980, and on August 29, 1980, the court entered its order denying preliminary injunctive relief.

On September 8, 1980, plaintiffs filed a Notice of Appeal, and on December 11, 1980 oral argument was presented to the Eighth Circuit Court of Appeals. On December 31, 1980 the Eighth Circuit issued an order affirming the District Court and directing that a final judgment on the merits be entered as expeditiously as possible.

B. *Ten-Day Notice*

Notice of the co-payment program and cuts in optional Medicaid services was mailed to all eligible Medicaid recipients by the Iowa Department of Social Services on June 2, 1980. This was twenty-eight (28) days before the July 1, 1980, date on which the co-payment program and service eliminations were to become effective. The notice stated which Medicaid services would be subject to co-payments, the amount of the co-payments, the optional services that would be eliminated, notice that children eligible under the Early and Periodic Screening Program (EPSDT) would not have to pay co-payment and would not be subject to service cuts, the reason and statutory basis for imposition of co-payments and elimination of optional services, and the effective date of these changes. The notice was silent as to whether administrative hearings would be afforded to aggrieved medical assistance recipients.

Thereafter, on August 1, a second notice was mailed to all Medicaid recipients in the State of Iowa which, in addition to containing the items set forth in the first notice, informed all recipients of their opportunity to an evidentiary hearing in the event that the recipient contended that the new rules and law were incorrectly applied to his or her factual circumstances. The notice set forth the procedure to obtain an appeal and

provided that "assistance will continue until final decision is made."

Defendants filed with the Court on August 7, 1980, a statement of intent to file a recipient notice. That statement set forth the form of notice that defendants proposed to send to all Medicaid recipients on August 20, 1980, and invited comment or criticism by plaintiffs. None was made. The proposed notice was actually sent to all Medicaid clients in the State of Iowa on August 20, 1980. It set forth all of the information contained in previous notices in a more extensive but simpler fashion. In addition, it stated that the co-payment program and optional service reductions mandated by HF 2580 had been challenged in court and that "the purpose of this notice was to explain more about the changes and to tell you that if the judge finds the prior notice invalid, the new effective date for changes will be September 2, 1980." Plaintiffs have conceded the adequacy of the third notice. Plaintiffs contend, however, that if the first notice was defective, the sending of a correct notice cannot cure the defect.

C. *Sixty-Day Notice*

During the last part of May or early part of June 1980, Steve Otto, Medicaid Program Specialist for the Health Care Financing Administration, Region VII, informed Chuck Ballinger and Lois Behrens of the Iowa Department of Social Services that it was his opinion that the sixty-day notice requirement of 42 C.F.R. § 447.205 (1980) was unnecessary for the co-payment provisions of the Iowa Medicaid cutbacks. However, on June 26, 1980, Judy D'Ambrosio, a member of the Region VII Medicaid staff, contacted Van Mahabal, an employee of the Department of Health and Human Services' Bureau of Program Policy in Baltimore, Maryland. Mr. Mahabal indicated that the introduction of co-payment affected the level of payment to the provider. He stated that if the method or level of reimbursement was changed, public notice would have to be provided. Subsequent communication to the Iowa Department of Social Services from federal officials apparently

convinced the Department of Social Services that the sixty-day notice requirement was necessary.

In any event, between November 5 and November 7, 1980, which the Department of Social Services published a notice in a major newspaper of all cities in the state with population of over 50,000 setting forth changes that were going to be made in the method and level of reimbursement for payment of hearing aids. Notice was given pursuant to 42 C.F.R. § 447.

### D. *Medical Assistance Advisory Council (MAAC)*

The Iowa Department of Social Services, pursuant to 42 C.F.R. § 431.12, has established a Medical Assistance Advisory Council (MAAC). The Council is composed of representatives of medical providers, clients of the Department of Social Services, and members of the public. During the several years preceding the Iowa Legislature's adoption of co-payment, various cost-saving techniques, including co-payment, were discussed in the meetings of the Medical Assistance Advisory Council.

In April of 1980, the Department of Social Services, at the request of the Iowa General Assembly submitted a "laundry list" of all public welfare programs of the Department, including Medicaid programs, which could lawfully be terminated, reduced, or changed in order to conserve the limited funds in the state treasury. The cost containment options for the Iowa Medicaid program which were presented to the legislature were developed by the General Services staff, the Chief of Medical Services, the Director of the Division of Community Programs within the Department of Social Services, and Commissioner Reagen.

On April 4, 1980, the agenda for the April 23, 1980 Medical Assistance Advisory Committee (MAAC) meeting was mailed to committee members. That agenda did not contain any items relating to the cost containment options which were developed or were being developed by Department of Social Services' personnel.

On April 18, 1980, House File 2580 passed the Iowa House of Representatives.

At its regularly scheduled meeting on April 23, 1980, the MAAC committee was orally informed of the possible cutbacks in the Medicaid program by Defendant Kassar. The presentation by Mr. Kassar at the April 23d meeting was the first time any information had been given to the MAAC committee relating to the cost curtailment measures. There was considerable discussion of cost-saving techniques, including co-payment, at this meeting.

On April 24, 1980, the day following the MAAC meeting, the Iowa Senate passed the cost-containment measures.

The first written materials to MAAC committee members concerning the Medicaid cutbacks were mailed out by DSS on May 23, 1980. Those materials included drafts of the new Employees' Manual provisions, provider notice, and recipient notice.

On May 26, 1980, the Governor signed House File 2580 into law. Notices announcing the Medicaid cutbacks were mailed out to recipients with their Medicaid cards on approximately June 1, 1980 and on June 26, 1980, the Department of Social Services adopted rules implementing the co-payment program and service eliminations.

### III. CONCLUSIONS OF LAW

Jurisdiction is conferred on this Court by 28 U.S.C. § 1343(3) and (4). The action is brought to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the Constitution of the United States, and thus arises under and is authorized by 42 U.S.C. § 1983.

Additionally, jurisdiction over all federal claims is conferred on this Court by 28 U.S.C. § 1331 in that the amount in controversy exceeds $10,000.00 exclusive of interest and costs.

### A. *Ten-Day Notice*

The first issue presented to the Court is whether plaintiffs were given adequate and timely notice of the changes in benefits. Pursuant to 42 C.F.R. § 431.200, *et seq.*

(1980), the state or local agency must give recipients and applicants ten days' notice of 1) their intended action; 2) the reasons for the action; 3) the authority for the action; and 4) the availability of an opportunity for a hearing.

The facts in this case show that the Iowa Department of Social Services (DSS) sent three notices in its attempt to comply with the regulations. The first two notices, sent on June 2, 1980 and August 1, 1980, were deficient in that they failed to adequately inform the plaintiffs of their potential opportunity for a hearing.

On August 20, 1980 a third notice was sent. It is this notice that forms the subject of the Court's first issue. The defendants assert that this notice contained all the necessary information for compliance with the regulation. Plaintiffs concede that the substance of the notice was sufficient but argue that it was not timely. It is the plaintiffs' contention that the ten-day notice must precede any alteration in benefits. Since the August 20, 1980 notice did not precede the effective date of the regulation, they contend that the notice is fatal and cannot be cured. Thus, under plaintiffs' theory, the benefits must be restored to their pre-July 1, 1980 levels and notice would have to be given again.

A similar circumstance was presented in *Turner v. Walsh*, 435 F.Supp. 707 (W.D.Mo. 1977). In *Turner, supra*, the court reviewed a Missouri statute that altered the method by which AFDC and Medicaid benefits are computed. The defendants failed to give adequate notice of the recipients' right to continued benefits if a request for a hearing was made within ten days of the notice. The court granted a temporary restraining order on this basis and further ordered that the deficient notice be cured by sending a supplemental notice specifying those rights omitted in the original notice.

At the time of trial on the merits, the defendants had not complied with the portion of the order requiring supplemental notice. Therefore, the court was forced to address the adequacy of the original notice. The court noted that it addressed this issue solely because of the possibility of further delay in issuing the supplemental notice. *Turner, supra* at 713.

The Eighth Circuit Court of Appeals approved of Judge Hunter's "balancing of equities" approach in what it termed "a well reasoned opinion", *Turner v. Walsh*, 574 F.2d 456 (8th Cir. 1978). This Court is similarly persuaded by this common-sense application of the regulation. The supplemental notice of August 20, 1980 therefore cures the earlier deficiencies in the notices sent by the DSS.

Further support for the Court's position can be found in *Benton v. Rhodes*, 586 F.2d 1 (6th Cir. 1978); *cert. denied* sub. nom. *Wisebaker v. Rhodes*, 440 U.S. 973, 99 S.Ct. 1539, 59 L.Ed.2d 791 (1979). In *Benton*, the court reviewed the adequacy of notice that accompanied a reduction in Medicaid benefits. This reduction in benefits was caused by inadequate funding from the state legislature. The court found the notice adequate even though it stated only that certain benefits would be cut and that the reason for the cuts was inadequate funding.

The decisive fact in *Benton, supra*, appears to be the reason for the benefit terminations. With respect to the reason, the court noted:

> In our opinion, when a state decides to terminate optional benefits on the basis of lack of appropriated funds, or for any other state reason, this is a matter of state law or policy which it was permitted to adopt. We find nothing in the Federal or State Constitutions giving prospective recipients of optional benefits a constitutional right to their perpetual continuance. Until the optional benefits were terminated all of the benefits could easily be obtained merely by the presentation of a medicaid card and the state agency had no way to control the amount applied for and received.

> When agency regulations are validly promulgated pursuant to legislative authority they have the force and effect of law.

*Benton, supra,* at 3. The Court finds this reasoning persuasive in light of the fact that state budget cuts precipitated the benefit reductions here under review.

The other cases cited by the plaintiff do not persuade the Court that the deficient ten-day notices could not be cured by the notice given on August 20, 1980. None of these cases present the situation where a timely but inadequate notice is supplemented by a notice that is adequate. The Court is convinced that *Turner v. Walsh, supra,* accurately reflects the law in the Eighth Circuit and that the supplemental notice approach was validated therein.

B. *Sixty-Day Notice*

█ Plaintiffs' next assertion is that the implementation of HF 2580 is defective in that the defendants failed to give the sixty-day public notice required by 42 C.F.R. § 447.205 (1980). Under this regulation "the agency must provide public notice of any proposed change in the method or level of reimbursement for a service, if the charge is expected to increase or decrease Medicaid payments for that service by 1% or more during the twelve months following the effective date of the change."

The defendants contend that such notice is unnecessary. They rely on Action Transmittal HCFA–AT–79–37 (MMB)[2] which states that the 60-day notice is required only when change in the method and level of payments change by 1% or more during the twelve months following the effective date of the change. They argue that since the provider of services receives the same compensation under co-payment as under the pre-July 1, 1980 system, the method and level has not changed.

The Court, in ruling on the motion for preliminary injunction, agreed with the defendants insofar as they contended that co-payment was not a change in the method of payment. However, after trial on the merits, the Court is now of the opinion that the elimination of a Medicaid service is a change in both the level and method of payment. Therefore, the sixty-day public notice was necessary for all categories of assistance that were projected to change by greater than 1% in the twelve months following the action.[3]

The Court is persuaded that the harm which accompanied this failure to give notice has been remedied by the subsequent notice given in November. While this type of compliance with federal regulations is not ideal, it is also not fatal. The regulation's purpose in assuring public awareness appears to have been satisfied.

C. *The Medical Assistance Advisory Council*

█ Plaintiffs challenge the manner in which House File 2580 was adopted and implemented on the ground that the Medical Assistance Advisory Council (MAAC) was not given adequate notice and/or an opportunity to consult and provide input during the legislative process as required by the Social Security Act, 42 U.S.C. § 1396a(a)(33)(A) and federal regulation, 45 C.F.R. § 246.10(a)(1)–(3).

The chronological sequence was that the MAAC met on April 23, 1980 and were told that the welfare officials were aware of House File 2580 that had passed the Iowa House on April 18 and was soon to be considered by the Iowa Senate and that it provided much the same provisions as the final bill (*see* n. 1). MAAC members did discuss the bill and its provisions on that day. The next day, April 24, 1980, the Iowa Senate passed the bill. The Governor signed the bill on May 26, 1980. It can hardly be contended that the MAAC council had any real input into what happened in

---

2. An Action Transmittal is an interpretive publication by the Department of Health, Education and Welfare Health Care Financing Administration. The subject of this particular Action Transmittal was entitled "Public Notice of Changes in Method or Level of Reimbursement."

3. At trial on the merits, the evidence established that only two categories of aid were projected to change by greater than 1%. These were the co-payment for drug program and the optical program.

either the Iowa House or Senate. There was scant time to contact Senate members and exert any influence. The Council undoubtedly could and did exert whatever influence it could muster both on welfare officials and the Governor prior to the time he signed the bill. It is clear that from the Council's point of view, the ideal situation would be for the Council to have ninety or more days' notice, with an opportunity for a full discussion of the proposals at three or four council meetings. This did not happen. The question is: Is the factual sequence set out above fatal to the upholding of the bill?

The plaintiffs say yes, the Council did not have the opportunity to operate as contemplated by the federal provisions.

The plaintiffs rely on the cases of *Budnicki v. Beal*, 450 F.Supp. 546, and *Becker v. Toia*, 439 F.Supp. 324. In *Budnicki*, before April 9, 1977, the Pennsylvania Medical Assistance (MA) program provided orthopedic shoes and braces to needy residents. On April 9, 1977, by publication, the Department of Public Welfare adopted a regulation significantly limiting the availability of said shoes and braces.[4] It was conceded that before the regulation was published on April 9, 1977, the Pennsylvania counterpart of a MAAC council was neither adequately advised of the proposed change nor given an adequate opportunity to participate in that decision. The implementation of the new regulation was apparently held in abeyance and on January 6, 1978, some nine months later, the Council members were sent a notice of the change in the program. The Council met on January 19, 1978 and discussed the orthopedic shoe program extensively. The *Budnicki* court held, at page 556:

> The discussion by the Council at its January 19, 1978 meeting demonstrates that the Council was adequately notified and

given an opportunity to discuss the reduction and therefore this requirement has been satisfied.

In a nutshell, the *Budnicki* court found procedures adequate where the Council had a chance to discuss the reduction of service some nine months after it was officially published[5] and was either already in force or about to be put in force. The Iowa Welfare Department was directed by the bill to create rules implementing the provisions of H.F. 2580. They took until June 26, 1980 to do this. The MAAC and others could exert additional influence on the Welfare Department until approximately that date.

In *Becker v. Toia, supra*, the State of New York had had no functioning MAC Council for over three years. Twenty members were to have been appointed but only six had actually received an appointment. None had been consulted. The *Becker* court concluded that the MAC Council was not in existence.[6] This is a clear violation of the statute and the *Becker* court had no alternative but to find that the requirements of 45 C.F.R. § 246.10 and of § 365–c of the New York Social Services Law had not been met.

The Iowa MAAC had as much opportunity for notice and input as did the Pennsylvania Council and more than the New York Council.

In light of *Budnicki*, and the "balancing of the equities," as mentioned by Judge Hunter in *Turner v. Walsh, supra* at 715, the Court finds that the requirement for MAAC participation, while far from ideal, has been satisfied.

IT IS THEREFORE ORDERED that the Clerk of Court enter judgment for the defendants and against plaintiffs on plaintiffs' claims.[7]

---

4. In Pennsylvania the "reduction" was accomplished by an agency of the state publicizing a new regulation. In Iowa the "reduction" was accomplished by legislative action after admittedly "vigorous debate."

5. In preparing this opinion, the Court consulted the office of the *Budnicki* judge to verify the

above-mentioned dates, as there seemed to be the possibility of typographical error. There was none.

6. *Becker v. Toia*, 439 F.Supp. 324, 332.

7. The Court notes that the Eighth Circuit's earlier opinion ordered this Court to expedite the trial of this matter. On January 7, 1981, this

Court issued a similar order to the parties to this suit. Between January 7, 1981 and the present date, a great deal of activity has taken place in this action.

On January 9, 1981, plaintiffs filed two Notices to Take Depositions on January 23, 1981. On January 14, 1981, this Court held a conference call to attempt to narrow the issues before the Court and to expedite discovery matters.

On February 2, 1981, plaintiffs filed a third amended complaint which defendants answered on February 23, 1981. The months of February and March were spent on discovery matters and the filing of motions. A pre-trial conference was held on March 2, 1981.

On March 30, 1981, trial commenced and the parties presented part of this case to the Court. Due to the absence of a government witness, however, trial had to be continued until April 19, 1981. Both parties presented proposed findings of fact and conclusions of law to the Court on April 24, 1981. Defendants submitted a rebuttal to plaintiffs' proposed findings on April 30, 1981.

Between May 1, 1981 and the present date, this Court has considered many submissions and conducted several trials. The Court gave this cause its attention at the earliest possible moment under the circumstances.