Rosier JENNINGS, by his next friend, Kathleen Jennings; Hershel Choate; Wilma Ann Hyder; Clyde Vaughn, by his next friend, Edath Vaughn; Paul Ramone Parsons, by his next friend, Lou Ann Brady; Rebecca West, by her next friend, Paulette West; Michelle Ogle, by her next friend, Linda Sue Ogle; Eldon Kerr; Stella Harris; Sadie I. Owens; Margaret Betty and Charles Baldwin, on their own behalves and as next friend for Mary and Charles Baldwin; and Carrie Clemmons

v.

Lamar ALEXANDER, in his official capacity as Governor of the State of Tennessee; Eugene Fowinkle, individually and in his official capacity as Commissioner of the Department of Public Health; Ben Crim, individually and in his official capacity as Assistant Commissioner of the Department of Public Health; and Carolyn Hale, in her official capacity as Director of Cumberland County Department of Human Services.

No. 80–2043–NE–CV.

United States District Court,
M. D. Tennessee,
Northeastern Division.

June 17, 1981.

James J. Barrett, III, Legal Services, Cookeville, Tenn., Gordon Bonnyman, Legal Services of Middle Tenn., Inc., Nashville, Tenn., William Bush, Southeast Tenn. Legal Services, Chattanooga, Tenn., Susan Clasbey, South Central Tenn. Legal Services, Columbia, Tenn., for plaintiffs.

Frank Scanlon, Asst. Atty. Gen. for the State of Tenn., Nashville, Tenn., C. Hayes Cooney, Nashville, Tenn., for defendant.

## MEMORANDUM

MORTON, Chief Judge.

The plaintiffs in this case, all recipients of Medicaid benefits in Tennessee, seek to permanently enjoin the state's proposed reduction in Medicaid coverage for inpatient hospital care from the current limit of 20 days per year to a proposed maximum of 14 days per year. Although the complaint originally challenged a comprehensive array of proposed changes, and as recently as the March 13, 1981, bench trial also challenged various changes in the Medicaid drug formulary, the parties have now reached agreed settlements on all issues except the reduction in inpatient hospital coverage.

On September 3, 1980, this court preliminarily enjoined all the challenged reductions in Medicaid coverage, such injunction to remain in effect until further order of the

court. The basis for that injunction was the state's failure to consult a properly constituted Medicaid Medical Care Advisory Committee prior to proposing the changes in violation of 42 U.S.C. § 1396a(a)(4) and 42 C.F.R. § 431.12. *Jennings v. Alexander*, No. 80–2043, Memorandum Opinion Sept. 3, 1980. It now appears that a properly constituted advisory committee has been given adequate opportunity to participate in formulating proposed changes in the Medicaid program, and therefore the reason for which the preliminary injunction was granted no longer exists. Thus, the court will examine the arguments specifically raised against the proposed reduction in coverage for inpatient hospital care to determine whether the injunction as to that proposal should be lifted, extended or made permanent.

As noted in the Memorandum Opinion of September 3, 1980, this court has subject matter jurisdiction under both 28 U.S.C. §§ 1331 and 1343. *See Hagans v. Lavine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); and *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). That jurisdiction has not been challenged.

General background on the Medicaid program in Tennessee is provided in the September 3, 1980, Memorandum Opinion and is adopted herein by reference. For present purposes, it will suffice to reiterate that Medicaid is a cooperative undertaking of the federal and state governments, and that while participation by the state is voluntary, once the state decides to participate, it must do so in compliance with the requirements of Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396 *et seq.*, (hereinafter sometimes referred to as Title XIX) and the applicable federal regulations. *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), *reh. den.* 448 U.S. 917, 101 S.Ct. 39, 65 L.Ed.2d 1180 (1980).

The plaintiffs have raised four general arguments against the proposed reduction in hospital coverage to a maximum of 14 days per year. First, it is argued that the limitation will discriminate against handi-capped Medicaid recipients in violation of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (hereinafter "§ 504"), and the regulations promulgated thereunder. Second, the plaintiffs contend that the reduction is inconsistent with the best interests of Medicaid recipients, in violation of 42 U.S.C. § 1396a(a)(19). Third, it is argued that any reduction in services is invalid without prior approval of the Secretary of Health and Human Services. The parties have stipulated that no such approval has been obtained. Finally, the plaintiffs contend that the injunction should remain in effect because of the state's failure to publish notice of the proposed change as required by 42 C.F.R. § 447.205. The court will address these contentions *seriatim*.

*Alleged Discrimination Under § 504*

The argument that the proposed reduction in inpatient hospital coverage to 14 days per year will discriminate against handicapped Medicaid recipients in violation of § 504 raises interesting questions of both law and fact. The court must first determine whether the plaintiffs have shown that the proposed limitation will have the alleged discriminatory impact if it is implemented. If the plaintiffs have met their burden of persuasion on the threshold issue of discriminatory impact, the court must then address what is apparently an issue of first impression: That is, whether a ceiling on coverage for required Medicaid services which adversely affects a greater percentage of handicapped than non-handicapped Medicaid recipients amounts to discrimination "solely by reason of ... handicap," in violation of § 504.

Section 504 provides in relevant part as follows:

No otherwise qualified handicapped individual ... as defined in section 706(7) of this title, shall, *solely by reason of his handicap*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794 (emphasis added). The relevant portion of the statutory definition of "handicapped individual" reads:

[A]ny person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment.

29 U.S.C. § 706(7)(B).

Regulations duly promulgated pursuant to § 504, and specifically applicable to health, welfare and social service programs, further refine the concept of discrimination on the basis of handicap. 45 C.F.R. § 84.-52(a) provides that:

General. In providing health, welfare, or other social services, a recipient [of federal funds] may not, on the basis of handicap:

(1) Deny a qualified handicapped person these benefits or services;

(2) Afford a qualified handicapped person an opportunity to receive benefits or services that is not equal to that offered nonhandicapped persons;

(3) Provide a qualified handicapped person with benefits or services that are not as effective (as defined in § 84.4(b)) as the benefits or services provided to others;

(4) Provide benefits or services in a manner that limits or has the effect of limiting the participation of qualified handicapped persons; or

(5) Provide different or separate benefits or services to handicapped persons except where necessary to provide qualified handicapped persons with benefits and services that are as effective as those provided to others.

In order for a service to be as effective in serving the handicapped as it is in serving others, such services or benefits

are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement.

45 C.F.R. § 84.4(b)(2).

It is undisputed that the State of Tennessee is a recipient of federal funds in connection with the Medicaid program, and thus that the program is within the scope of § 504 and the regulations cited above. It is likewise undisputed that a number of recipients of Medicaid benefits in Tennessee, including certain of the named plaintiffs in this action [1] are "handicapped individuals" as that term is defined in the Rehabilitation Act, 29 U.S.C. § 706(7)(B), supra. Therefore, those plaintiffs have standing to challenge the proposed reduction.[2]

Evidence presented at the trial of this case established that for fiscal year 1979–80, 341,960 persons were eligible for Medicaid benefits in Tennessee. Of these, 90,668 were classified as handicapped. For the period between July 1, 1979, and June 30, 1980, 51,140 Medicaid recipients utilized one or more days of inpatient hospital care.[3] Of

---

**1.** The complaint sought class action certification as to the class of Medicaid recipients generally, as well as to various subclasses, including handicapped recipients. No hearing was held and no determination was made on the propriety of certifying any of the subclasses. Such certification would probably have been unnecessary in any event, since injunctive relief if granted would have necessarily benefitted all recipients, but in view of the court's decision to deny the § 504 claim on the merits, it is clearly not necessary to decide whether the subclass should be certified.

**2.** It is generally accepted, and has not been challenged here, that § 504 creates an implied private right of action for handicapped individuals allegedly subjected to unlawful discrimination. See Lynch v. Maher, 507 F.Supp. 1268 (D.Conn.1981); Camenisch v. University of

Texas, 616 F.2d 127 (5th Cir. 1980) (vacated and remanded on other grounds, 449 U.S. 1075, 101 S.Ct. 853, 66 L.Ed.2d 797 (1981). See also cases cited in Camenisch, supra, 616 F.2d at 131, and S.Rep.No.93–1297, 93rd Cong. 2d Sess. 39–40, reprinted in 4 U.S.Code Cong. & Ad.News 6373, 6391 (1974).

**3.** There is a discrepancy of 70 recipients between two exhibits which purport to reflect total inpatient usage for the same year. Exhibit D–6c, which shows subtotals for handicapped and nonhandicapped groups, is the source of the 51,140 figure. Exhibit D–4a, broken down according to categorically needy and medically needy shows a total usage of 51,070. The court's choice of the former was based on the need to compare handicapped and nonhandicapped, but the analysis would not be affected by a total reduction of 70 users.

these Medicaid users of inpatient hospital care, 16,852 were handicapped and 34,288 were nonhandicapped.[4] The evidence further showed that for the fiscal year examined, 72.6% of the handicapped users would have been fully served by 14 days of hospital inpatient coverage. Stated otherwise, 27.4% of all handicapped users in 1979–80 needed more than 14 days of inpatient hospital treatment. By contrast, 92.2% of all nonhandicapped users were fully served at 14 days or less, leaving only 7.8% in need of inpatient hospital care beyond the 14th day.

Other testimony compared inpatient hospital utilization rates for handicapped and nonhandicapped users on the basis of "recipient years of eligibility" rather than the straight calculation of days of service used. The purpose of the latter calculation was to compensate for an apparent inflation of figures that results from handicapped users requiring year-round treatment, compared with others who required service only periodically. Without going into detail, suffice to say that this evidence also showed substantial disparity. For the year 1979–80, the utilization rate for handicapped was 60.1 recipients per thousand recipient years of eligibility, compared with 11.3 recipients per thousand recipient years of eligibility for nonhandicapped.

The plaintiffs use these figures to argue that the proposed 14-day limitation will have a disparate impact upon handicapped Medicaid recipients. They point out that the percentage of handicapped users not fully served at day 14 was almost four times as great as the percentage of nonhandicapped users who needed more than 14 days' coverage per year. Because of this apparent disparity, the plaintiffs contend that handicapped recipients subject to a 14-day limitation would be denied access to services offered to nonhandicapped recipients, and that the inpatient services available to the handicapped would be less effective than the services available to nonhandicapped recipients, in violation of § 504 and 45 C.F.R. § 84.52(a), *supra.* It is also argued that this reduction in services would work to impair the accomplishment of the objectives of Title XIX, as stated in 42 U.S.C. § 1396, in specific violation of 45 C.F.R. § 84.4(b)(4).[5]

The court concludes that the plaintiffs' arguments must fail for two independent but equally compelling reasons. First, the court finds that the plaintiffs have failed to carry their burden of establishing that the limitation of 14 days of hospital coverage will in fact have a discriminatory impact upon handicapped Medicaid recipients. Second, even if the evidence were found to establish that a disparate impact upon the handicapped as a statistical group would result from the limitation, the court would hold that such an impact is not the type of discrimination that § 504 was intended to proscribe.

From the evidence presented, there can be no doubt that if a 14-day limit on inpatient hospital coverage had been in effect in fiscal year 1979–80, the impact upon the handicapped as a statistical group would have been greater than the impact upon the nonhandicapped. However, there does not appear to be any sound basis for concluding that a similar disparity would necessarily result in another year subject to such a

---

**4.** Thus, 18.586% of handicapped eligibles received one or more days of inpatient hospital care, as compared with 13.644% of nonhandicapped eligibles. This relatively small percentage of total persons eligible for Medicaid care constitutes the group referred to herein as "users."

**5.** 42 U.S.C. § 1396 provides, in relevant part, that the purposes of the Medicaid Act include furnishing:

(1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and

resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care . . . .

45 C.F.R. § 84.4(b)(4) provides in relevant part:

A recipient [of federal funds] may not . . . utilize criteria or methods of administration . . . (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons.

limitation. No evidence was offered that the ratio of handicapped to nonhandicapped inpatient hospital usage remains in any sense constant from year to year. Rather, the evidence on the issue of disparate impact consisted entirely of various analyses of statistics for a single fiscal year, and thus established no foundation for a proper extension of the figures into the future.

■ Furthermore, the plaintiffs' argument assumes that the presence of handicaps in fact accounts for the statistically higher hospital usage by the handicapped group. Such an assumption is not compelled, even for the 1979–80 year, and no evidence was offered which might convincingly warrant it.[6] Thus the plaintiffs' argument requires both an assumption as to causation and an inference that the 1979–80 figures are representative of likely future hospital usage, neither of which is warranted. And the court will not base its holding on mere speculation. Therefore, the court holds that the plaintiffs have failed to establish a prima facie case that the proposed limitation on inpatient hospital coverage to 14 days per year will have a discriminatory impact upon handicapped Medicaid recipients.

Even if the disparity shown in 1979–80 were assumed to be representative of future trends in Medicaid usage, the court does not believe that a violation of § 504 would have been established. The section proscribes discrimination "solely by reason of ... handicap." 29 U.S.C. § 794. As previously stated, the evidence in this case failed to show any causal connection between the existence of handicaps and the need for hospital care in excess of 14 days. The statistics merely revealed a correlation for the study year between handicapped users and a need for more days of hospital care than nonhandicapped users. Since there was no evidence that the presence of handicaps was the reason that the handicapped group seemed to require an average of more days of hospital care, it is difficult to conceive how the disparity could be considered discrimination "solely by reason of ... handicap."

The plaintiffs contend that the mere existence of a disparity is sufficient to make out a prima facie case of discrimination under § 504. They argue that the section proscribes discriminatory effect, and that nothing else need be shown, citing cases in which facially neutral programs were held violative of § 504, e. g., N.A.A.C.P. v. Wilmington Medical Center, Inc., 491 F.Supp. 290 (D.Del.1980); Lloyd v. Regional Transportation Authority, 548 F.2d 1277 (7th Cir. 1977); New Mexico Association for Retarded Citizens v. State of New Mexico, 495 F.Supp. 391 (D.N.Mex.1980). The plaintiffs also point to 45 C.F.R. § 84.4(b)(4), supra, and its prohibition of "criteria or methods of administration" with the effect of discriminating against the handicapped. Finally, reliance is placed upon the Department of Health, Education and Welfare's May 17, 1976, Statement of Policy interpreting § 504, which states:

[h]andicapped persons may require different treatment in order to be afforded equal access to federally assisted programs and activities, and identical treatment may, in fact, constitute discrimination.

41 Fed.Reg. 20296 (May 17, 1976). Thus, the plaintiffs argue that the proposed limitation of inpatient hospital services to 14 days per year, although facially neutral, in effect discriminates against the handi-

---

**6.** For example, there was no attempt to show what percentage of handicapped users required inpatient hospital treatment as a result of their handicapping condition. It seems likely that some handicaps, such as blindness, would rarely require hospitalization, while others, such as mental illness, might well require frequent hospitalization. Without some such evidence, the court is left to speculate on what extent the existence of handicaps in the broad sense of § 504 affects the statistical disparity shown for the study year. Indeed, the actual impact of the proposed limitation, even in the study year, should be kept in perspective. Since only 18.586% of handicapped eligibles used any inpatient hospital services, and 27.4% of those needed more than 14 days, only about 5% of the handicapped eligibles were in need of more than 14 days of hospital treatment. Thus, 95% would have been fully served at 14 days.

capped, and must be remedied by implementing some alternative criteria.[7]

The court does not believe that any of the cited authority is dispositive of the instant case. *N.A.A.C.P. v. Wilmington Medical Center Inc., supra,* concerned, *inter alia,* allegations that the relocation of an inner-city hospital to the suburbs would disproportionately affect handicapped as well as minority persons in the service area. The court discussed the appropriate test for alleged violations of § 504 and adopted an "adverse impact" test. The court said that § 504

> requires that recipients of federal funds take affirmative action to make their programs equally accessible to the handicapped as well as forbidding them from taking actions which will have a disparate adverse effect upon the handicapped. Failure to comply with either requirement constitutes a *prima facie* violation of Section 504.

491 F.Supp. at 317–18. However, the court went on to note the provisions of 45 C.F.R. § 84.4(b)(2), *supra,* to the effect that identical results are not required, and stated that as long as the handicapped were "given access to medical care equal to that afforded the general population, no discrimination will be found." *Id.,* at 318. The court then held that on the facts before it, no prima facie case had been established under § 504.

Thus, it is far from clear that the *Wilmington Medical Center* court intended to adopt as strict an "impact test" as the plaintiffs contend. Rather, it would appear that the court recognized that a program need not be equally productive for handicapped and nonhandicapped alike, as long as the program is equally accessible to both groups.

In the case at bar, the plaintiffs' initial argument that the handicapped will be denied access to Medicaid inpatient hospital services if the proposed limitation is implemented, is simply untenable. Both handicapped and nonhandicapped Medicaid recipients will have identical hospital services available for their use, subject to the same durational limitation. The alleged problem is not with access, but with the end result. And, as the *Wilmington Medical Center* court recognized, neither the statute nor the accompanying regulations require a program to achieve identical results for handicapped and nonhandicapped recipients.

Although *Lloyd v. Regional Transportation Authority, supra,* contains language indicating that a strict discriminatory impact test ought to be applied in § 504 cases, the court in that case did not apply the test, but merely vacated the district court's summary dismissal, and remanded for a decision on the merits. In addition, the court's concern in *Lloyd* was clearly with the inability of mobility handicapped persons to gain access to urban transportation. As stated, *supra,* the court cannot conceive how the present case can be characterized as a denial of access to services.

Furthermore, the alleged discrimination in *Lloyd* resulted from the very existence of a particular genre of physical impairment, i.e., those conditions requiring confinement to a wheelchair, and was thus squarely within the § 504 prohibition of discrimination "solely by reason of ... handicap." In the present case, it is not a particular handicap which is allegedly subject to discrimination. Rather, the plaintiffs contend that the entire range of handicapped persons, within the broad definition of that term, 29 U.S.C. § 706(7)(B), *supra,* taken as a statistical group, are subjected to discrimination by virtue of the asserted greater need for more inpatient hospital care than other Medicaid recipients. As explained, *infra,* this court does not believe that § 504 goes that far.

---

**7.** The plaintiffs ask the court to either require the continuance of the current 20-day limitation, or, if the court should determine that the present limitation also creates a disparate adverse effect, order the implementation of an alternative proposal limiting hospital stays on a per-stay basis, rather than a per-year basis. Some evidence was admitted to the effect that the latter proposal would result in reducing the cost to the state of the inpatient services, without a disparate impact upon handicapped.

*New Mexico Association for Retarded Citizens v. State of New Mexico, supra,* is arguably more helpful to the plaintiffs here. The court therein found state and local school boards in violation of § 504 and the accompanying regulations for failure to provide a free appropriate public education to students suffering from mental retardation and learning disabilities. The court in that case also adopted an impact test and issued a mandatory injunction requiring affirmative action to comply with the statutory and regulatory requirements.

However, the *New Mexico* case, like *Lloyd*, involved clear discrimination on the basis of specific disabilities. In addition, the failure of the defendants in *New Mexico* to take appropriate steps to adequately educate the state's handicapped children amounted to a *de facto* denial of access to the state's public educational services. Just as persons confined to wheelchairs are denied access to city buses they are unable to mount, retarded children are denied education in a classroom where teachers and techniques are suitable only for "normal" children. The plaintiffs in *New Mexico* sought only an equal opportunity to be educated; they sought meaningful access to some education where all had been effectively denied. They did not, as the plaintiffs do here, seek additional services to ensure that they emerged from the schools with the best education possible, or to guarantee that relatively identical percentages of handicapped and nonhandicapped children would emerge from school adequately educated. In short, the *New Mexico* plaintiffs were concerned with meaningful access; the plaintiffs here are concerned with similarity of results.

Similarly, the HEW Statement of Policy is apparently concerned with access. No indication is given that the agency ever envisioned mandating equal results for handicapped and nonhandicapped. To the contrary, 45 C.F.R. § 84.4(b)(2), *supra*, squarely refutes any such intention.

In the case most closely on point to the case at bar, the plaintiffs challenged a limitation in Pennsylvania's Medicaid coverage to 60 days per year for inpatient care in a private mental institution, when no such limit existed on inpatient hospital care for physical illness. *Doe v. Colautti,* 592 F.2d 704 (3d Cir. 1979). In affirming the district court's denial of a preliminary injunction, the court noted that care in a mental institution was an optional Medicaid service, which participating states may but need not provide, while inpatient hospital care for physical problems is a required service. The court held that § 504 could not have been intended to negate the distinction between the two types of services which Congress had expressly allowed in the Medicaid Act, and further noted that patients with mental handicaps were allowed full treatment for physical ailments, just as nonhandicapped recipients. Thus, the court could not find the likelihood of prevailing on a § 504 claim sufficient to support a preliminary injunction.

The present case can be distinguished from *Colautti* in that here the challenged limitation will affect a mandatory Medicaid service rather than an optional one. However, if the limitation is allowable under Title XIX, then the distinction becomes meaningless. The court determines that states may legitimately limit the inpatient hospital care provided under their Medicaid plans, and further that the particular limitation proposed in this case is allowable.[8]

While some coverage for inpatient hospital care must be provided in the state's Medicaid plan, 42 U.S.C. §§ 1396a(a)(13) and 1396d(a), there is no requirement that Medicaid pay for all such services needed. Indeed, the specific requirement for provision of inpatient hospital services is included as part of the definition of "medical assistance," which expressly allows for "payment of *part or all* of the cost of the

---

8. As explained, *infra*, the court finds that the plaintiffs' argument for enjoining the reduction of benefits on the ground that it is inconsistent with the best interests of Medicaid recipients to be without merit. Similarly, the court holds that the reduction will not impair the accomplishment of the objectives of Title XIX.

[required] care and services." 42 U.S.C. § 1396d(a) (emphasis added). Thus, the states are allowed to set reasonable limits on the amount, scope and duration of services provided under the Medicaid program. *See Beal v. Doe,* 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977). The court holds that a proposed limitation which, even when the evidence is considered most favorably to the plaintiffs, would fully serve at least 95% of the group allegedly most harmed by the limitation,[9] is reasonable and is allowed under Title XIX. In the absence of some indication of contrary Congressional intent, § 504 will not be read as invalidating this otherwise allowable limitation. *See Colautti, supra.*

While agreeing that a disparate impact test is the appropriate standard to apply in a § 504 case, the court holds that the adverse impact arguably shown in this case does not amount to discrimination under § 504. This conclusion is based upon several factors.

First, and most importantly, the court is convinced that the statutory language prohibiting discrimination "solely by reason of ... handicap" does not encompass the kind of disparity which the plaintiffs attempted to show in this case. Assuming, *arguendo,* that the plaintiffs had successfully established that the proposed limitation would have a disparate adverse impact upon handicapped Medicaid recipients taken as a statistical group (a question previously resolved against the plaintiffs), such an impact would not be by reason of any handicap. In reaching this conclusion, the court notes that both handicapped and nonhandicapped Medicaid recipients have full and unquestioned access to the same type and duration of inpatient treatment. Furthermore, the same durational limit works without regard to any particular handicapping condition and regardless of the particular cause of hospitalization. Indeed, it might well be assumed that of those Medicaid recipients subject to a particular handicap, some will be fully served by 14 days of inpatient care, while others will need fur-

ther treatment. Coverage will be terminated under the proposed limitation when a particular recipient has exhausted the 14 days of coverage, whether the recipient is handicapped or not. The court can find no discrimination by reason of handicap.

In addition, any disparate adverse impact which the plaintiffs may have shown would be evident only in terms of the end result, and therefore under 45 C.F.R. § 84.4(b)(2), *supra,* could not amount to a denial of equally effective services. The handicapped and nonhandicapped will be afforded equal care in both quality and quantity, and the claim that fewer handicapped than nonhandicapped will be fully served does not establish a violation of § 504.

Finally, although the court is persuaded that some level of a disparate impact test is the appropriate standard to apply, it is clear that not all federally funded programs which fail to serve the handicapped and nonhandicapped on an equal basis can be held in violation of § 504. For example, in *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), the Court refused to find a violation of § 504 where a state refused to take affirmative action to make its nursing program fully accessible to a deaf student. That case contains some rather broad language which calls into question whether affirmative action is ever required under § 504. *Id.,* 442 U.S. at 411–12, 99 S.Ct. at 2369–70, 60 L.Ed.2d at 991–92.

More recently, it has been held that Department of Transportation regulations requiring affirmative action to make urban transportation systems fully accessible to mobility handicapped individuals were not within the department's authority to promulgate under § 504. *American Public Transit Association v. Lewis* (D.C.Cir. May 26, 1981), *see* synopsis at 49 U.S.L.W. 2756. This case is important, since it provides a post-*Southeastern Community College* analysis of the one area in which § 504 had been consistently held to require affirmative action to remedy disparate impact in a facial-

9. *See* Note 6, *supra.*

ly neutral program,[10] and thus demonstrates the court's belief that the results reached in the prior cases are untenable in view of the Supreme Court's decision in *Southeastern Community College.*

These two cases alone would compel the conclusion that the kind of statistical impact asserted by the plaintiffs in the case at bar does not amount to a violation of § 504. Additionally, even if some disparate impact were to have been established, the court does not believe that, under the analysis of the Court in *Southeastern Community College,* affirmative relief would be warranted.

In summary, the court holds that § 504 does not require a state to structure its Medicaid program so that relatively equal percentages of handicapped and nonhandicapped recipients are fully served by a particular type of benefit, as long as the benefit is equally available to both groups. So long as a service is offered in equal quality, scope and duration to both handicapped and nonhandicapped recipients, and handicapped recipients are actually afforded equal access to that service, the mandates of § 504 have been satisfied. The State of Tennessee's proposed limitation on inpatient hospital coverage to 14 days per year operates without regard to handicap, provides services that are equally available to all Medicaid recipients, and thus does not violate § 504.

*The "Best Interest" Requirement*

The plaintiffs next contend that the proposed limitation is in violation of 42 U.S.C. § 1396a(a)(19), which provides as follows:

(a) A state plan for medical assistance must—

. . . .

(19) provide such safeguards as may be necessary to assure that eligibility for care and services under the plan will be determined, and such care and services will be provided in a manner consistent with . . . the best interests of the recipients.

It is argued that the best interests of the plaintiffs require that any reductions in Medicaid services be made with the least injury possible to Medicaid recipients. The plaintiffs argue that this goal can best be accomplished by implementation of a limitation based upon days per hospital stay, rather than total days per year. As noted previously, some evidence was offered that such a limitation would achieve the desired cost savings, without the asserted disparate impact upon handicapped recipients.

In support of their position, the plaintiffs rely primarily upon two cases dealing with Medicaid coverage of medically necessary abortions, *Hodgson v. Board of County Commissioners,* 614 F.2d 601 (8th Cir. 1980), and *Roe v. Casey,* 623 F.2d 829 (3rd Cir. 1980). However, neither of these cases is particularly helpful in resolving the question presently before the court. The *Hodgson* court based its holding upon a finding that Minnesota's restriction on Medicaid payments for abortions to those necessary to save the life of the mother, or in cases of rape or incest, was an impermissible denial of medical care on the basis of diagnosis, type of illness or condition. 614 F.2d at 608. The best interest requirement was cited, but never expressly discussed nor relied upon.

In *Casey,* the court held that Pennsylvania's refusal to fund abortions except when necessary to save the life of the mother was in violation of the requirements of Title XIX, as modified by the "Hyde Amendment" to the 1980 Appropriation Act, P.L. 96–123, § 109, 93 Stat. 926 (1979) but again failed to include any discussion of the best interest requirement. Rather, it appears that the decision of the district court in that case was again based on a finding of discrimination on the basis of diagnosis, type of illness or condition. Thus, the majority of the court of appeals panel never directly discussed the "best interest" argument. The concurring judge would have found the state statute in violation of the best interest requirement as well as the prohibition of

---

10. *See, e.g., United Handicapped Federation v. Andre,* 558 F.2d 413 (8th Cir. 1977); *Leary v. Crapsey,* 566 F.2d 863 (2d Cir. 1977); *Lloyd v. Regional Transportation Authority,* 548 F.2d 1277 (7th Cir. 1977); *Bartels v. Biernat,* 427 F.Supp. 226 (E.D.Wis.1977).

discrimination because of type of condition. 623 F.2d at 839–40 (Hunter, J., concurring). But Judge Hunter did not offer even the slightest explanation of the appropriate standard for judging whether a state service limitation is in the best interests of Medicaid recipients, and thus his opinion provides little guidance for future application of the requirement.

The statute relied upon by plaintiffs, 42 U.S.C. § 1396a(a)(19), *supra*, appears as part of the general requirements for state plans which must be approved by the Secretary of Health and Human Services prior to the state's receipt of federal funds for the Medicaid program. *See* 42 U.S.C. § 1396. The provision was included in the original version of Title XIX, as part of the 1965 amendments to the Social Security Act. The purpose of the section was stated to be:

> [T]o provide some assurance that the States will not use unduly complicated methods of determining eligibility which have the effect of delaying in an unwarranted fashion the decision on eligibility for medical assistance or that the states will not administer the provisions for services in a way which adversely affects the availability or the quality of the care to be provided.

S.Rep.No.404, 89th Cong., 1st Sess., *reprinted in* [1965] U. S. Code Cong. & Ad. News 1943, at 2017.

The present case raises the question whether the proposed limitation should be held invalid because it allegedly adversely affects the availability of inpatient hospital services to handicapped recipients, in spite of the existence of a less burdensome alternative. However, in light of the court's decision that the plaintiffs have failed to show that the limitation will have a discriminatory impact on handicapped recipients, it would be incongruous indeed to now hold that a less injurious alternative must be implemented.

The plaintiffs would have the court second-guess the decisions of the Medicaid policy makers and substitute its judgment of what would be a more desirable alternative. This the court refuses to do. The purpose of requiring state officials to consult with a Medicaid Medical Care Advisory Committee, constituted in accordance with applicable statutory and regulatory requirements, is to assure that the interests of Medicaid recipients will be taken into account in arriving at important policy and administrative decisions in regard to Medicaid. *See* Memorandum Opinion of September 3, 1980. Such consultation has apparently now been had in the present case, and absent some clear indication that the statutory guidelines have not been met, the court will defer to the policy decisions duly made.

■ No such clear indication of statutory violation is present here. Rather, even if the court had accepted the plaintiffs' argument that the statistics on inpatient hospital usage for 1979–80 were representative of a general trend, and thus showed some likely disparate adverse impact on handicapped recipients, the evidence would still show that 95% of all handicapped recipients would be fully served with a 14-day-per-year limitation.[11] Thus the court would be constrained to hold that the evidence clearly established that the limitation was not in the best interests of recipients, especially where it is so abundantly clear, as it is here, that some cost savings measures must be taken if the Medicaid program is to continue to serve those in need. The facts of the case at bar simply do not provide a proper case for substitution of the court's judgment as to the most appropriate way to achieve the desired savings for that of the officials whose duty it is to make such decisions.[12]

*Prior Approval of the Secretary of Health and Human Services*

■ The parties have stipulated that the proposal to reduce the inpatient hospital

---

11. *See* note 6, *supra*.

12. It should be noted that the Secretary of Health and Human Services maintains continuing oversight responsibility for state plans, to ensure their continued compliance with the statutory requirements. *See* 42 U.S.C. § 1396c. This oversight provides an additional safeguard that the interests of recipients will not be ignored in policy decisions.

coverage from 20 to 14 days has not thus far been approved by the Secretary of Health and Human Services (HHS). Thus the court is presented with a purely legal question whether such approval is required prior to the implementation of such a change. The court concludes that prior approval is not required.

The argument advanced by the plaintiffs that prior approval is required is based upon the proposition that a state Medicaid plan must initially receive approval prior to federal funding of the state's program, 42 U.S.C. § 1396, and the fact that HHS maintains oversight responsibility to assure that the state's plan remains in compliance with the statutory requirements. 42 U.S.C. § 1396c; *National Welfare Rights Organization v. Finch*, 429 F.2d 725, 728 (D.C. Cir. 1970) (construing obligations under other titles of the Social Security Act). From these premises, the plaintiffs contend that it plainly follows that no alterations can be made in the approved state plan without prior approval.

The plaintiffs have characterized this argument as "the soul of simplicity." However, in reality it is the soul of oversimplification. Such a requirement would effectively hamstring the ability of state administrators to respond to changing demands on the Medicaid program or to respond to fiscal crises such as the one currently facing the State of Tennessee.

In addition, requiring prior approval of program changes does not square with certain express provisions of Title XIX. In relevant part, 42 U.S.C. § 1396c provides as follows:

> If the Secretary, after reasonable notice and opportunity for hearing to the State agency administering or supervising the administration of the State plan approved under this subchapter, finds—
>
> (1) that the plan has been so changed that it no longer complies with the

provisions of section 1396a of this title;

. . .

. . . .

> the Secretary shall notify such State agency that further payments will not be made to the State (or, in his discretion, that payments will be limited to categories under or parts of the State plan not affected by such failure), until the Secretary is satisfied that there will no longer be any such failure to comply.

This language clearly contemplates that the states do in fact have the latitude to modify their Medicaid plans, as long as such modifications are in conformity with the statutory requirements. Congress could easily have provided that no state plan could be modified without prior approval of the Secretary, but instead authorized the Secretary to invoke sanctions when modifications were found to be out of compliance with the statute.

To read a requirement of prior approval into the statute would be to engage in legislation by judicial fiat, a practice this court is not wont to adopt. The result would be both to add a requirement which Congress has not seen fit to include, and to substantially obviate the need for 42 U.S.C. § 1396c(1), *supra*. The court therefore holds that Title XIX does not require prior approval by the Secretary of HHS of modifications in the state Medicaid plan.[13]

*Public Notice Requirements*

Finally, the plaintiffs argue that the proposed reduction in inpatient hospital care must be enjoined because of the state's failure to comply with the public notice requirements of 42 C.F.R. § 447.205. That regulation provides, in relevant part, as follows:

> (a) *When notice is required.* Except as specified in paragraph (b) of this section [not applicable in the case sub judice], the agency must provide public notice of any

---

**13.** This conclusion also appears wholly consistent with applicable regulations, which make express provision for prior approval in one situation only. Where a proposed change would alter the method of reimbursing hospitals for services provided, prior approval must be

obtained. 42 C.F.R. § 447.261(a). This specific provision coupled with the absence of similar regulations covering other types of changes leads to the conclusion that HHS does not view prior approval of most state plan modifications as mandatory.

proposed change in the Statewide method or level of reimbursement for a service, if the change is expected to increase or decrease Medicaid payments for that service by 1 percent or more during the 12 months following the effective date of the change.

. . . .

(c) *Content of notice.* The notice must—

(1) Describe the proposed change in method or level of reimbursement;

(2) Give an estimate of any expected increase or decrease in annual aggregate expenditures;

. . . .

(4) Identify a local agency in each county (such as the social services agency or health department) where copies of the proposed changes are available for public review;

(5) Give an address where written comments may be sent and reviewed by the public; . . . .

Such notice is further required to be published at least 60 days before the proposed effective date of the change and appear in both a state register and the newspaper of widest circulation in each city in the state with a population of 50,000 or more. 42 C.F.R. § 447.205(d).

The salient facts concerning the public notice given in the present case are not disputed. On or about June 15, 1980, notice was published in the required newspapers outlining the changes under consideration, including the possible reduction in inpatient hospital benefits. This notice stated that the Tennessee Department of Public Health (DPH) intended, on August 15, 1980, "to make some or all" of the described changes in the Medicaid program. Interested persons were invited to write to the Commissioner of Public Health if they desired to comment on the proposals.[14] In addition, the notice stated that copies of the exact proposed changes would be made available for inspection in all county offices of the Tennessee Department of Human Services

(DHS) prior to August 1, 1980 (only two weeks before the proposed effective date of the changes).

The proposed changes made available in county DHS offices on or about August 1, 1980, made no mention of the plan to reduce inpatient hospital coverage to 14 days per year. To the contrary, the notice posted in county DHS offices expressly stated that "[i]n-patient hospital services . . . will be limited to twenty days per fiscal year," and continued with a proposal to generally limit weekend hospital admissions to emergency cases.

Testimony offered by the defendants at the August 16, 1980, preliminary injunction hearing established that at the time the proposals were sent to DHS offices, the state had no plans to make a reduction in inpatient hospital coverage. Rather, DPH at that time intended only to implement a penalty on hospitals with low occupancy rates as an alternative way to save state money. On August 11, 1980, however, DPH was advised by the Federal Department of Health and Human Services that such a penalty could not be imposed without prior HHS approval. *See* 42 C.F.R. § 447.261(a), and discussion, *supra.* DPH therefore decided to reduce the number of inpatient hospital days rather than await HHS approval of the proposed penalty.

■ The court finds that the state has failed to comply with the public notice requirement of 42 C.F.R. § 447.205 in its failure to make the proposal to reduce inpatient hospital benefits available for public review in county DHS offices. In reaching this conclusion the court need not address the questionable propriety of delaying the posting of notice in county offices until two weeks before the proposed effective date of the changes. While the regulations are silent as to the timing of this particular requirement, the practical value of complying at such a late date would be dubious, at best. In the present case, however, there was simply no compliance whatsoever. The

---

**14.** Other parts of the notice outlined changes contemplated by the Comptroller of the Treasury and directed comments to that office. These proposals are not relevant here.

notice finally made available in county DHS offices did not include the proposal to limit inpatient hospital coverage to 14 days per year.

To the contrary, that notice was affirmatively misleading in its statement that inpatient care would be limited to 20 days per year. A concerned Medicaid recipient who had been informed by the newspaper notices that a reduction in inpatient care might be implemented and who desired to learn exactly what changes were contemplated would surely have had his fears falsely allayed by the notice posted in his local DHS office. The only effect of this misinformation would certainly have been to discourage comment on the proposal which otherwise might have been forthcoming. The tactic was in direct contravention of the policy behind the notice requirement of "foster[ing] complete information to the public as to the cost of medical care to the needy." *Philadelphia Welfare Rights Organization v. O'Bannon*, 501 F.Supp. 517 (E.D.Penn.1979).

The fact that the plaintiffs offered no evidence that any Medicaid recipients ever actually relied upon the posted notice or ever attempted to comment on the proposed change is irrelevant. Likewise irrelevant are the facts that the state conducted hearings which were not required by federal law at which the proposed reduction in inpatient benefits was discussed and that the proposal was included in the notice published in the Tennessee Administrative Register.

The plain truth is that federal regulations establish a particular procedure for notifying the public exactly what changes in Medicaid reimbursement procedures are being considered. This procedure includes an opportunity to inspect the text of the proposals which are to be made available in county offices throughout the state. And the simple fact is that this procedure was not complied with. The court must therefore conclude that the preliminary injunction previously issued preventing implementation of the proposed reduction of inpatient hospital benefits must be extended pending compli-

ance with the public notice requirements of 42 C.F.R. § 447.205.

An appropriate order will be entered.