Rosier JENNINGS b/n/f; Kathleen Jennings; Hershel Choate; Wilma Ann Hyder; Clyde Vaughn b/n/f; Edith Vaughn; Paul Ramone Parsons b/n/f; Lou Ann Bradley; Rebecca West b/n/f; Paulette West; Michaelle Ogle b/n/f; Linda Sue Ogle; Eldon Kerr; Stella Karris; Sadie I. Owens; Margaret Betty; Charles Baldwin; Carrie Clemmons, Plaintiffs-Appellants,

v.

Lamar ALEXANDER; Eugene Fowinkle; Ben Crim; Carolyn Hale, Defendants-Appellees.

No. 81–5629.

United States Court of Appeals, Sixth Circuit.

Argued July 27, 1983.

Decided Aug. 4, 1983.

tion. In each case the actual issue was whether the evidence was sufficient to fulfill the statutory requisite.

**1038**

G. Gordon Bonnyman, Jr., Nashville, Tenn., Susan Garner (argued), Murfreesboro, Tenn., Robert L. Ray, Nashville, Tenn., James J. Barrett, III, Rural Legal Services of Tenn., Inc., Cookeville, Tenn., for plaintiffs-appellants.

1. Medicaid is a voluntary undertaking by a state. The federal government places no ceiling on funds to a state program, but federal funds are contingent upon matching funds by the state. Although the program is voluntary, once a state decides to participate, it must do so in conformity with the requirements of Title XIX of the Social Security Act of 1965 and applicable regulations. *Harris v. McRae,* 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980).

William M. Leech, Jr., Atty. Gen. of Tenn., Frank Scanlon, Asst. Atty. Gen. (argued), Nashville, Tenn., for defendants-appellees.

Before KEITH, MERRITT and JONES, Circuit Judges.

KEITH, Circuit Judge.

Appellants, Medicaid recipients from the State of Tennessee, challenge the State's attempt to restructure its Medicaid Plan. Appellants contend that Tennessee's proposed reduction in the number of hospital days covered by Medicaid from twenty to fourteen per annum violates Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 and Section 1902(a)(19) of the Medicaid Act, 42 U.S.C. § 1396a(a)(19). They also argue that any reduction must be approved by the Secretary of Health and Human Services. After a bench trial, the district court dismissed each of Appellants' claims. For the reasons set forth below, we vacate the district court's order and remand this case for further consideration not inconsistent with this opinion.

This action was originally brought in the United States District Court for the Middle District of Tennessee on behalf of all the State's Medicaid recipients. It challenged an array of proposed reductions by the State designed to save money on the State's share of Medicaid expenditures.[1] The proposed reductions included, *inter alia,* deletion of certain drugs from the Medicaid formulary, reductions in the level of reimbursement for health care providers, reduction of inpatient hospitalization coverage, and reduction of outpatient hospitalization services. Appellants also sought to enjoin the proposed reductions because they had not been approved by a valid Medicaid Medical Care Advisory Committee as pre-

The State of Tennessee provides approximately thirty state dollars for each seventy dollars the federal government contributes. For fiscal year 1980–81, the Tennessee General Assembly "appropriated state dollars which, when matched with federal funds, constituted a budget of $388,000,000." This figure represented a $26,000,000 increase over the State's Medicaid budget for the preceding year.

scribed by federal regulations. 42 C.F.R. § 431.12.

On September 3, 1980, the district court enjoined the State's promulgation of the proposed reductions until a validly constituted Medical Care Advisory Committee had reviewed them. On December 12, 1980, the State petitioned the district court to set aside the preliminary injunction. The State argued that a properly constituted committee had not acted after having sufficient time to do so. The court did not rule on this motion.

By the time of the March 13, 1981 bench trial, the validity of only two proposed reductions were at issue: the deletion of certain drugs from the Medicaid formulary and the reduction in the number of inpatient days for which Medicaid would pay. Prior to the district court's opinion on June 17, 1981, the parties settled the former issue. Only the validity of the State's reduction in hospitalization coverage remained to be resolved by the court.

In its opinion, the district court held (1) that the proposed reduction did not violate Section 504 of the Rehabilitation Act of 1973, (2) that the proposed reduction was not inconsistent with the best interests of the recipients in contravention of 42 U.S.C. § 1396a(a)(19), and (3) approval from the Secretary of Health and Human Services was not needed to implement the changes. However, the court found that the State had failed to comply with the procedures outlined in 42 C.F.R. § 447.205 which establish guidelines for providing public notice of proposed changes. Therefore, the court refused to set aside its September 3, 1980 preliminary injunction.

## I.

The initial question for review is whether the district court erred in holding that the proposed reduction from twenty to fourteen days per annum does not violate Section 504. The district court held that the appellants had not made a showing of discrimination against the handicapped because there had been no showing of disparate impact upon handicapped persons. Furthermore, the court held that even if Appellants had proved disparate impact, the disparate impact was not discrimination against the handicapped as contemplated by the Rehabilitation Act of 1973. We disagree.

## A.

29 U.S.C. § 794 provides in relevant part:

> No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.[2]

2. Handicapped individual is defined at 29 U.S.C. 706(7):

(7) (A) Except as otherwise provided in subparagraph (B), the term "handicapped individual" means any individual who (i) has a physical or mental disability which for such individual constitutes or results in a substantial handicap to employment and (ii) can reasonably be expected to benefit in terms of employability from vocational rehabilitation services provided pursuant to subchapters I and III of this chapter.

(B) Subject to the second sentence of this subparagraph, the term "handicapped individual" means, for purposes of subchapters IV and V of this chapter, any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment. For purposes of sections 793 and 794 of this title as such sections relate to employment, such term does not include any individual who is an alcoholic or drug abuser whose current use of alcohol or drugs prevents such individual from performing the duties of the job in question or whose employment, by reason of such current alcohol or drug abuse, would constitute a direct threat to property or the safety of others.

For purposes of this case, statistics relating to handicapped recipients include "only those recipients whose Medicaid eligibility is based on blindness or disability." All recipients over sixty-five (65) are classified as aged whether or not they are blind or disabled. Furthermore, "[o]f those recipients of inpatient services who have only Medicaid (no Medicare) coverage, 1,833 are 'aged'." Since the parties could not

The courts which have considered the issue have uniformly held that Section 504 creates a private cause of action for those who are its intended beneficiaries. *See infra* note 4 and accompanying text. Although the Supreme Court did not address this issue in *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1981), its actions in several cases suggest that the Court has assumed that a private cause of action exists in Section 504 cases. *Id.*[3]

Though a thorough examination of this issue has already been provided by several circuit courts, we note our agreement that sound judicial analysis supports implying a private cause of action for injunctive relief. In its discussion of the Technical and Clarifying Amendments to the Rehabilitation Act, the Senate Report explained:

Section 504 was patterned after and is almost identical to, the antidiscrimination language of section 601 of the Civil Rights Act of 1964, 42 U.S.C. 2000d–1 (relating to race, color, or national origin) and section 901 of the Education Amendments of 1972, 42 U.S.C. 1683 (relating to sex). The section therefore constitutes the establishment of a broad government policy that programs receiving Federal financial assistance shall be operated without discrimination on the basis of handicap. It does not specifically require the issuance of regulations or expressly provide for enforcement procedures, but it is clearly mandatory in form, and such regulations and enforcement are intended.

The language of section 504, in following the above-cited Acts, further envisions the implementation of a compliance program which is similar to those Acts, including promulgation of regulations providing for investigation and review of recipients of Federal financial assistance, attempts to bring non-complying recipients into voluntary compliance through informal efforts such as negotiation, and the imposition of sanctions against recipi-

ents who continue to discriminate against otherwise qualified handicapped persons on the basis of handicap. Such sanctions would include, where appropriate, the termination of Federal financial assistance to the recipient or other means otherwise authorized by law. Implementation of section 504 would also include pre-grant analysis of recipients to ensure that Federal funds are not initially provided to those who discriminate against handicapped individuals. Such analysis would include pre-grant review procedures and a requirement for assurances of compliance with section 504. This approach to implementation of section 504, which closely follows the models of the above-cited anti-discrimination provisions, would ensure administrative due process (right to hearing, right to review), provide for administrative consistency within the Federal government as well as relative ease of implementation, and permit a judicial remedy through a private action.

S.Rep. No. 1297, 93d Cong., 2d Sess. *reprinted in* 1974 U.S.CODE CONG. & AD.NEWS 6373, 6390–91.

The guidelines enunciated in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) for implying a private cause of action are clearly met. First, Section 504 was enacted for the special benefit of handicapped persons as defined in the Rehabilitation Act. Second, there is express language in the legislative history which supports a congressional intent to imply a private cause of action. Third, the structure and underlying purpose of the Act is consistent with the implication of a private judicial remedy. Finally, the cause of action is not one generally relegated to the states and inappropriate for federal law. We, therefore, agree with the other circuits that have considered the issue and hold that Section

---

agree on how many of these recipients were handicapped, they are all reflected in the statistics as non-handicapped.

**3.** *See, e.g., Campbell v. Kruse*, 434 U.S. 808, 98 S.Ct. 38, 54 L.Ed.2d 65 (1977), where the Supreme Court vacated the district court's order and remanded the case for a decision based on

504 creates a private cause of action for its intended beneficiaries.[4]

### B.

Section 504 is "part of the general corpus of discrimination law." *New York State Association for Retarded Children v. Carey,* 612 F.2d 644 (2d Cir.1979). It is predicated on Title VI of the Civil Rights Act, 42 U.S.C. § 2000d et seq., and is intended to prohibit the expenditure of public funds in programs that discriminate against the handicapped. *See* Sen.Rep. 1297, *supra.* Courts have generally applied the same tests of discrimination law to Section 504 as are applied to Title VI.

In *N.A.A.C.P. v. The Medical Center, Inc.,* 657 F.2d 1322 (3d Cir.1981) (*en banc*), the Third Circuit exhaustively considered the evidence needed to prove a prima facie violation of Title VI. Having concluded that Title VI requires only that a plaintiff prove disparate impact in the application of federal funds, the court concluded, "The Rehabilitation Act and the Age Discrimination Act of 1975 provide equally strong cases for application of an impact test since both are patterned after Title VI." *Id.* at 1331. *See also Bryan v. Koch,* 627 F.2d 612, 621 (2d Cir.1980).

■ Both *Bryan* and *The Medical Center* involved the use of federal funds by a state or municipal government to implement a facially neutral policy which affected certain protected groups more harshly than others. As Judge Kearse noted in *Bryan,* the regulatory agencies responsible for effectuating Title VI-type statutes have applied "a broad 'disparate impact,' or 'effects,' test." (Separate Opinion of Judge Kearse at 621). Indeed, the regulations promulgated under Section 504 specifically forbid the use of federal funds for programs which have discriminatory effects against the handicapped.[5] Regulations by the enforcing agency are entitled to great weight. *Brennan v. Owensboro-Davies County Hospital,* 523 F.2d 1013, 1028 (6th Cir.1975), *cert. denied,* 425 U.S. 973, 96 S.Ct. 2170, 48 L.Ed.2d 798 (1976).

■ The district court acknowledged authority for applying an effects test in this case. It then proceeded to distinguish cases applying an effects test, most notably the district court opinion in *The Medical Center.*[6] The district court concluded that *The Medical Center* was not applicable. We disagree.

---

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794.

**4.** *See Leary v. Crapsey,* 566 F.2d 863 (2d Cir. 1977) (*per curiam*); *N.A.A.C.P. v. The Medical Center, Inc.,* 599 F.2d 1247 (3d Cir.1979), *aff'd.,* 657 F.2d 1322 (3d Cir.1981) (*en banc*); *Davis v. Southeastern Community College,* 574 F.2d 1158 (4th Cir.1978), *rev'd on other grounds,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979); *Camenisch v. University of Texas,* 616 F.2d 127 (5th Cir.1980), *cert. granted,* 449 U.S. 950, 101 S.Ct. 352, 66 L.Ed.2d 213, *vacated,* 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *Lloyd v. Regional Transportation Authority,* 548 F.2d 1277 (7th Cir.1977); *United Handicapped Federation v. Andre,* 558 F.2d 413 (8th Cir.1977); *Kling v. County of Los Angeles,* 633 F.2d 876 (9th Cir.1980); *Pushkin v. Regents of the University of Colorado,* 658 F.2d 1372 (10th Cir.1981); *Prewitt v. United States Postal Service,* 662 F.2d 292 (11th Cir.1981) (former Fifth Circuit opinion).

**5.** 45 C.F.R. 84.4 (1981) provides in relevant part:

§ 84.4 Discrimination prohibited.

(a) General. No qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity which receives or benefits from Federal financial assistance.

\* \* \* \* \* \*

(4) A recipient may not, directly or through contractual or other arrangements, utilize criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons, or (iii) that perpetuate the discrimination of another recipient if both recipients are subject to common administrative control or are agencies of the same State.

**6.** The district court opinion in this case was rendered before the Third Circuit's panel and *en banc* opinions in *N.A.A.C.P. v. The Medical Center.*

The factual distinction between this case and *The Medical Center* is not analytically significant for purposes of determining what constitutes a prima facie case. *The Medical Center* involved the relocation of a hospital from an inner-city location to a suburban site. This was challenged as having an adverse effect upon minorities and the aged as well as the handicapped. The district court concluded that an effects test should be applied. After extensive litigation, the Third Circuit, sitting *en banc*, affirmed the application of an adverse effects test, but found that the plaintiff had not produced enough evidence to prove a prima facie case. *See also Prewitt v. United States Postal Service,* 662 F.2d 292 (5th Cir.1981) (application of a discriminatory impact test when federal government is the employer in handicapped discrimination case); *Bryan v. Koch,* 627 F.2d 612 (2d Cir.1980) (expressing no view on issue, the court assumed disparate impact test to be appropriate but found city had met its burden of rebuttal).

We think the district court erred by confusing the prima facie case with a decision on the ultimate outcome. The district court, seeking to minimize the importance of the *The Medical Center* district court, opined:

Thus, it is far from clear that the *The Medical Center* court intended to adopt as strict an "impact test" as the plaintiffs contend. Rather, it would appear that the court recognized that a program need not be equally productive for handicapped and nonhandicapped alike, as long as the program is equally accessible to both groups.

518 F.Supp. 877 (M.D.Tenn.1981). But the appellate opinions in *The Medical Center* hold that the establishment of a prima facie case is merely a prelude to the court's assessment of whether the alternative chosen is discriminatory against the handicapped. The establishment of disparate impact is not determinative of whether the defendant is guilty of discrimination. It merely requires the defendant to rebut the inference of discriminatory action. We therefore hold that the showing of disparate impact proved a prima facie case and required the state to explain its choice.

### C.

Alternatively, the district court held that even if discriminatory impact had been shown, the plaintiffs had failed to prove a prima facie case. The court reasoned:

For example, there was no attempt to show what percentage of handicapped users required inpatient hospital treatment as a result of their handicapping condition. It seems likely that some handicaps, such as blindness, would rarely require hospitalization, while others, such as mental illness, might well require frequent hospitalization. Without some such evidence, the court is left to speculate on what extent the existence of handicaps in the broad sense of § 504 affects the statistical disparity shown for the study year. Indeed, the actual impact of the proposed limitation, even in the study year, should be kept in perspective. Since only 18.586% of handicapped eligibles used any inpatient hospital services, and 27.4% of those needed more than 14 days of hospital treatment. Thus, 95% would have been fully served at 14 days.

518 F.Supp. at 883 n. 6. Again, we disagree. We agree with the district court that the statistical evidence was not perfect. But we also note that since a significant number of Medicaid recipients have been omitted from the statistics, it is much more likely that the numbers understate the disparity between handicapped and non-handicapped Medicaid users.[7]

Furthermore, the district court's statement that no evidence was presented which would suggest that the disparity would con-

---

7. *See supra* note 2. We also note that the State concedes that its proposed reductions have a disparate impact on the handicapped. The State's appellate brief admits:

The statistics and studies were computed and analyzed by the parties in several different ways during the course of the trial. Suffice it to say, the studies indicated that the handicapped population of Medicaid recipients would suffer proportionally more from the reduction in hospital benefits than the non-handicapped Medicaid recipients.

tinue is clearly erroneous. Along with their statistical evidence, the plaintiffs presented medical testimony which described the inpatient hospitalization pattern of patients with certain handicaps. For example, Dr. Samuel Marney, who specializes in the treatment of pulmonary ailments, testified upon deposition that patients suffering from asthma, emphysema, chronic bronchitis, or other obstructive lung diseases often "require longer hospitalization for intensive therapy than fourteen days." Dr. Georgia Montouris, a neurologist, testified upon deposition that, "Degenerative diseases of neurology often require hospitalizations." She further testified that fourteen days a year would not adequately take care of such patients' needs. Dr. Joseph Stinson stated in his deposition that in his experience the average asthma patient requires hospitalization four to five times a year with an average stay of ten to fourteen days. Dr. Gordon Turner, a surgeon, testified upon deposition that limitations on the number of days rather than number of admissions often caused handicapped persons to delay surgery until minor surgery became major surgery.

Even if we were not persuaded by the bare statistical evidence, the opinions of these medical experts along with other expert testimony would convince us that the plaintiffs presented a prima facie violation of Section 504. The medical evidence buttresses the position that these statistics are probative of discrimination against the handicapped.[8]

D.

Having found a prima facie violation of Section 504, we now find it appropriate to consider the justification offered by the State for adopting the fourteen day inpatient maximum. We consider this justification along with the plaintiff's contention that an alternative was available which would save the State the same amount of money and have a less discriminatory effect on the handicapped.

We begin our analysis with an acknowledgement that the State has a great deal of latitude in structuring the services it provides to its citizens. But it may not use federal funds in a program which discriminates against a racial group (Title VI), a particular sex (Title IX), or individuals with handicaps (Section 504). Moreover, we agree with the court's opinion in *New York State Association for Retarded Children v. Carey* at 650:

> Requiring governmental agencies to rebut in court a prima facie case of discrimination against the handicapped does not mean that the expertise of responsible administrators is to be denigrated. When the validity of challenged governmental action turns on an assessment of technical matters foreign to the experience of most courts, it may be entirely appropriate to resolve closely contested disputes in favor of the responsible administrators.

The State clearly proved that it was justified in attempting to reduce its Medicaid expenses. "No one would contest that the [State] must assign priorities among com-

8. The dissenting opinion argues that this case is more analogous to *Doe v. Colautti,* 592 F.2d 704 (3d Cir.1979) and other cases which discuss physical access to facilities. The dissent appears to agree with the district court that "physical access" is all that section 504 requires. Yet such a wooden notion of access is clearly not what was intended by the enactment of section 504. Rather, "access" must be read in terms of the goals of the Act. 45 C.F.R. § 84.4(b)(2) requires that the handicapped be given an equal opportunity to succeed at the goal of the program. Further, 45 C.F.R. § 84.-4(b)(4) states that the program must be run in a manner that does not impair the objectives of the plan. Though not every inequality in the number of days provided to handicapped and

non-handicapped persons constitutes discrimination against the handicapped, it certainly would be too simplistic an analysis to hold that all the Medicaid program requires is a particular number of days in the hospital. Rather, it is likely that the objective is to afford the best cure, therapy, or preventative treatment that the allotted funds can provide. This is made clear by the Tennessee law defining medical assistance as the "payment of the cost of care, services and supplies necessary to prevent, diagnose, correct or cure conditions in the person." Tenn.Code Ann. § 14–23–103(2). The disparate impact shown here, we conclude, shows the kind of inequality sought to be prevented by section 504.

peting economic demands and evaluate political and economic alternatives." *Bryan* at 621 (Separate Opinion of Judge Kearse). The evidence presented showed that the Medicaid program would have required $42,000,000 additional dollars to maintain the same level of services during fiscal year 1980–81 as were provided in fiscal year 1979–80. Since the State of Tennessee is prohibited by statute from deficit spending in its Medicaid program, it must provide services within the means granted by its General Assembly. The plaintiffs do not dispute this, and this court accepts these parameters.

But the plaintiffs contend that the State could achieve the same level of savings by an alternative method. They argue that the State could achieve the desired level of savings by limiting the total number of visits per annum rather than the number of days. According to plaintiffs, this alternative is preferable because the handicapped would not be deterred from going to the hospital earlier. Thus, the illness could be diagnosed and treated at an earlier stage, decreasing the need for long periods of hospitalization. Moreover, testimony was presented that, in individual cases, hospitals are not likely to eject Medicaid patients who exhaust their Medicaid days while in the hospital. But many hospitals will refuse entrance to sick persons who have no Medicaid days left. Dr. Marney, Dr. Turner, and Dr. Stein all indicated in their testimony that it would be better for the patients to have a system where they could come to the hospital on numerous occasions than to have a fixed number of days.

On the other hand, the State produced no evidence to rebut the plaintiff's claim. Rather, the evidence indicated that the State only considered two alternatives. The first was a change in the reimbursement method for health care providers. This was hastily withdrawn when the providers protested and it was learned that such a change would require approval from the Department of Health, Education and Welfare. A reduction in the services provided to Medicaid patients was instituted in its place. The testimony of Mr. James E. Word, Deputy Commissioner of Public Health, indicated that no attention was given to the discriminatory impact this might have on the handicapped or any group.

■ Federal courts are not empowered to substitute their judgments for that of State officials charged with administrative fact-finding and decision making having to do with the state. *New York State Association for Retarded Children v. Carey*, 612 F.2d at 648; *Bryan v. Koch*, 627 F.2d at 619; *The Medical Center*, 657 F.2d at 1338.

> However, the courts are .... assigned a sensitive task, and that task is to ensure that the established legal standards—constitutional and statutory—are followed by government agencies. To permit the factual determinations of these agencies to go unchallenged may be to neglect this task, for the facts will often be dispositive, and the question of compliance with legal standards will often be determined by the manner in which the agency has found the facts.

*Carey,* 612 F.2d at 648.

■ In this case, the plaintiffs proved a prima facie case of discrimination against the handicapped *and* purported to present an alternative which had a less discriminatory impact and would meet the State's need to save money. When a recipient of federal funds uses the money in a manner which has a disparate impact, Section 504 requires, at the least, that the State show that its decision-making process was a rational one. *Bryan v. Koch,* 627 F.2d at 621 (Separate Opinion of Judge Kearse) (in the context of Title VI and racial discrimination).

This is not an onerous burden. It merely requires the recipient to present some evidence that its decision is the product of lawful process which complies with minimum statutory standards. Courts are not free to ignore claims of discrimination merely because they are against a state. As the Second Circuit has noted:

> Clearly, deference to a state agency's fact finding is inappropriate once that agency is the defendant in a discrimination suit. The agency is required to come forward in the district court with sufficient evi-

dence to rebut the plaintiff's *prima facie* case (footnote omitted).

*Carey,* 612 F.2d at 649.[9]

Because the State failed to present any evidence to rebut the plaintiff's prima facie case, we must remand. Plaintiffs have established a prima facie case of discrimination against the handicapped. The State now has the burden of coming forward with some substantial justification for the adoption of the plan with the greater discriminatory impact. Or the State may demonstrate that the alternative method offered by Appellants will not accomplish the State's objective of cost-saving.[10]

## II.

Appellants also maintain that the State's decision is contrary to the best interests of Tennessee Medicaid recipients. Thus, it is contended, the reduction violates Section 1902(a)(19) of the Medicaid Act, 42 U.S.C. § 1396a(a)(19).[11]

The only authority cited by appellants is *Budnicki v. Beal,* 450 F.Supp. 546 (E.D.Pa. 1978). In *Budnicki,* the court held that an alteration in a state's Medicaid program will meet 1396a(a)(19)'s standards if it is "not irrational, or arbitrary and counterproductive to the medical well-being of all Medicaid recipients." *Id.* at 557. *Accord Philadelphia Welfare Rights Organization v. O'Bannon,* 517 F.Supp. 501, 508 (E.D.Pa. 1981) aff'd, 681 F.2d 808 (3rd Cir.1982).

Assuming that this is the correct standard, there is no basis for finding the State's proposed reductions to be arbitrary or counterproductive to the interests of all Medicaid recipients. If the fourteen day per annum limitation is implemented, ninety-five percent of all Medicaid recipients will have their hospitalization needs met. Though this court might have fashioned a different set of priorities, the best interests criteria do not transform this court into an administrative body.

## III.

The final issue on appeal is whether the State was required to obtain approval from the Secretary of Health and Human Services before adopting the new changes. The parties stipulated that the reduction in hospital coverage had not been approved.

**9.** Our antidiscrimination analysis is similar to that employed in *N.A.A.C.P. v. The Medical Center, Inc.,* 657 F.2d 1322 (3d Cir.1981) (*en banc*) and *Bryan v. Koch,* 627 F.2d 612 (2d Cir.1980). In *Wilmington Medical Center,* the court found that the defendant had justified its decision to relocate an inner city hospital to a suburban site although the relocation adversely affected certain protected groups. The court affirmed the district court which required the defendant to prove that it had chosen the least discriminatory site.

In *Bryan,* the court refused to require the defendant to consider alternative sites. But in its discussion of this issue, the court cautioned, "We do not foreclose the possibility of a situation where some arrangement, other than the closing of a facility, has such obvious advantages that it must be considered as an alternative to a closing with a significant disproportionate impact." *Id.* at 619. We think that an alternative plan which promises to provide better health service at comparable costs is of such importance that it must at least be considered by the state when the proposed plan would adversely affect the health care of handicapped persons.

**10.** We are at a loss to explain the statement in the dissenting opinion which argues that this analysis "creates a whole new source of challenges to state budgetary decisions." We merely interpret a congressional enactment which requires that participant-states consider the impact of changes in their Medicaid program on certain identifiable groups. These groups include racial groups and the elderly as well as the handicapped. The State, by its own admission, failed to consider the impact of the proposed reductions on any group.

While one might disagree with the congressional decision to include the handicapped in its set of protected individuals, our obligation is to strike a balance between the rights conferred upon the handicapped by Congress and the State's right to structure its Medicaid program as it chooses *as long as that choice is non-discriminatory.*

**11.** 42 U.S.C. 1396a(a)(19) provides,

(a) A State plan for medical assistance must—

\* \* \* \* \* \*

(19) provide such safeguards as may be necessary to assure that eligibility for care and services under the plan will be determined, and such care and services will be provided in a manner consistent with simplicity of administration and the best interests of the recipients.

The district court held that prior approval was not required. *Jennings*, 518 F.Supp. at 888. We agree.

42 U.S.C. § 1396c provides that the Secretary may terminate federal funding for the Medicaid program of a state if he finds:

(1) that the plan has been so changed that it no longer complies with the provisions of section 1396a ...; or

(2) that in the administration of the plan there is a failure to comply substantially with any such provision.

This standard clearly contemplates the adoption of changes in the original plan without prior approval from the Secretary. However, if the changes are subsequently determined to place the State out of compliance with federal regulations, the Secretary may impose sanctions on the State's entire Medicaid program or that portion which is unsatisfactory. Only when the proposed alteration involves a change in the reimbursement method is prior approval necessary. 42 U.S.C. § 447.261.

As the district court noted, the states have wide latitude in the modification of their plans. Only when the plan is out of conformity with federal statutory requirements will the federal administrators intervene. While "Congress could easily have provided that no state plan could be modified without prior approval of the Secre-

tary, [it] instead authorized the Secretary to invoke sanctions when modifications were found to be out of compliance with the statute." *Jennings*, 518 F.Supp. at 888.

IV.

In sum, we vacate the district court's judgment and remand for a determination in the following manner. The State should be required to provide a substantial justification for its choice of a reduction in inpatient hospital days when equal savings could be achieved by limiting the number of admissions covered by Medicaid. *Kampmeier v. Nyquist*, 553 F.2d 296, 299 (2d Cir.1977) ("substantial justification" for the policy); *New York State Association for Retarded Children v. Carey*, 612 F.2d at 650 ("must make at least some substantial showing in court that its plan is justified"). The State could also meet its burden by proving that a limit on the number of admissions will not yield the same amount of cost savings achieved by the State's per day restriction.[12] Second, we hold that Appellants have not established that the proposed changes are inconsistent with the best interests of Medicaid recipients. If the changes are eventually implemented, ninety-five percent of the State's Medicaid recipients will be served. Though we do have some concerns about the manner in which

---

12. In light of the dissent's mischaracterization of our holding in this case, we find it necessary to add the following observations. These observations should put to rest any thoughts that we are making it impossible or even difficult for Tennessee or any state to amend its Medicaid Plan.

First, contrary to the dissent's assertions, we are not making a finding of discrimination. We intimate no views on the ultimate outcome of this litigation. The dissent betrays a fundamental misunderstanding of antidiscrimination law by refusing to recognize the difference between a *prima facie* case of discrimination and an actual finding of discrimination.

Second, contrary to the dissent's assertion, we readily acknowledge the factual distinction between this case and the relocation of the inner-city hospital in *The Medical Center*. However, the two cases warrant similar analysis. That analysis only requires the state to explain why it imposes a needless burden on groups protected by section 504.

Third, *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), cited by the dissent, is simply inapplicable to the facts of this case. We agree with the dissent that if the relief sought by the appellants will require the expenditure of additional funds or impose a burden on the state, then a different case would be presented. We have reviewed the record meticulously and can discover no assertion by the State that it will have to engage in affirmative action to grant the requested relief. In fact, as noted above, the state never even considered the needs of appellants.

In sum, we take exception with the dissent's implication that we are revolutionizing the law under section 504. The dissenting opinion distills into a profound disagreement with the language of the section, and its statutory and regulatory scheme. While any analysis taken to its logical extreme would eventually lead to nihilism, requiring a state to justify what appears to be a violation of the law has not yet sent any state into chaos.

the original changes were adopted, we cannot say that the changes were irrational or arbitrary. Finally, we hold that the State is not required to obtain approval from the Secretary of Health and Human Services before the proposed changes become final.

Accordingly, the case is remanded for further proceedings not inconsistent with this opinion.

MERRITT, Circuit Judge, dissenting.

Assuming *arguendo* that it is appropriate for a federal court to reach the question, I agree with the Court's holding in Part II that the state's Medicaid plan is not "contrary to the best interest" of Medicaid recipients under 42 U.S.C. § 1396a(a)(19) (1976). I also agree with Part III of the opinion that the adoption of the Medicaid plan in Tennessee was not procedurally deficient.

For the reasons set out below, I disagree, however, with Part I of the opinion that the state of Tennessee may not reduce its Medicaid hospitalization coverage by six days per year without violating "the general corpus of discrimination law," (Majority Opinion p. 1040), specifically section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1976).

I.

The statute which we must interpret here, § 504, provides simply that no "handicapped individual" (defined as a person "regarded" as handicapped who has an "impairment which substantially limits ... major life activities") "shall, solely by reason of his handicap ... be subject to discrimination" under any program receiving federal funds. No further definition of "discrimination" is given.

I believe that the statute seeks only to secure for the handicapped equality of opportunity, or equality of access, in connection with government programs. It does not require a form of affirmative action or equality of results, as my colleagues insist. They hold that the plaintiffs have made a *prima facie* showing that Tennessee discriminated against the handicapped by reducing Medicaid coverage for inpatient hospital care from twenty to fourteen days per year. They base this holding on a finding that the reduction in coverage will have a disparate impact on some classes of "handicapped" patients (e.g., asthmatic patients): a higher percentage of these classes of "handicapped" recipients will have their *health* adversely affected by the cutback than other recipients. Although budgetary constraints are the reason for the State's action—the State can no longer afford to pay for the longer period of hospitalization—the majority finds discrimination in the method the State has chosen to reduce its budget. Conceding that equality of access is present, the majority says that the State may not make a modification in its program that has a more adverse effect on the health of some group of handicapped individuals than other medical patients. The majority points to the asthmatic patient, assumes without discussion that he is a "handicapped individual" within the meaning of the statute, and finds that the State must provide him with an "equal opportunity to succeed" in achieving good health (see note 8 of the majority opinion) in comparison with other patients.

Without a clear, bright-line distinction based on access, like the District Court makes, the Court's decision will create a whole new source of challenges to state budgetary decisions. People with physical ailments depend on a myriad of state services more heavily than do people with no ailments. When a local government decides to reduce the quality, frequency or financing for some service, for example, bus service, some group could make a case of discrimination, for example, by showing that they use the buses more than others. Across-the-board cuts in welfare, social security, education and many other benefits will affect some groups more than others and will open the way to litigation. I do not believe that Congress intended this statute to authorize the federal courts to step in and control the state budgetary process when cuts in appropriations affect asthmatics, or some other class of patients, somewhat more heavily than another group of patients.

The substantive right or benefit in question here, according to my colleagues, seems to be good health. Since they find that the budget cut affects the health of asthmatic patients more, they find discrimination. We all want good health for ourselves and others, but there is no constitutional, statutory or other substantive legal right to good health or to equality of "success" in achieving good health through governmental programs.

The Court may be right in its speculation, although I am not convinced by its reasoning or the statistical evidence, that the handicapped as a group, however defined, will be less healthy than the non-handicapped after 14 rather than 20 days in the hospital. But the problem with this assumption, even if true, is that Medicaid does not ensure better health. It grants only days of inpatient hospitalization free of charge. Medicaid only gives eligible individuals access to free hospital care for X days per year. Tennessee's decision to reduce the number of days of coverage in order to meet its budgetary requirements reduces free hospital care to the handicapped and non-handicapped equally. As District Judge Morton pointed out:

> Both handicapped and nonhandicapped Medicaid recipients will have identical hospital services available for their use, subject to the same durational limitation. The alleged problem is not with access, but with the end result.... [N]either the statute nor the accompanying regulations require a program to achieve identical results for handicapped and nonhandicapped recipients.

*Jennings v. Alexander,* 518 F.Supp. 877, 883 (M.D.Tenn.1981).

The majority relies heavily on *N.A.A.C.P. v. The Medical Center,* 657 F.2d 1322 (3d Cir.1981), for the proposition that a showing of discriminatory effect establishes a *prima facie* case under Section 504. That reliance is misplaced. The case involves only the question of access to medical facilities, a point the majority does not acknowledge or discuss. The issue in the case was the effect of relocating a medical center. Assuming *arguendo* the application of a disparate impact test, the Third Circuit found that

plaintiffs failed to make a *prima facie* showing that handicapped *access* to treatment would be lessened by the proposed move. It said nothing about the effect of the new facility's services on the health of the handicapped.

A case more analogous to the one before us, discussed extensively by the District Judge, is *Doe v. Colautti,* 592 F.2d 704 (3d Cir.1979). There a mental patient challenged the Pennsylvania Medicaid law, which provided unlimited inpatient coverage for treatment in private general hospitals but limited coverage for treatment in private mental hospitals to 60 days. Doe claimed this limitation discriminates against the handicapped who are mentally ill. The court held that private mental hospitalization coverage is not required at all and, therefore, the State's decision to provide a different measure of benefits for the two types of impairments does not violate § 504. It reasoned that § 504 does not "obliterate the distinctions between the medical care a state medical assistance program must cover and the care it need not include." *Id.* at 710. It is this same distinction that my colleagues have "obliterated" in this case.

The recent Supreme Court case, *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), delivers the *coup de grace* to the theory of equal treatment the majority seeks to establish in this case. In the *Southeastern Community College* case, Justice Powell, writing for a unanimous Court, held that a state's refusal to make modifications in its nursing education program to accommodate a deaf applicant does not violate § 504. Responding to plaintiff's argument that § 504 "requires Southeastern to make the kind of adjustments that would be necessary to permit her safe participation in the nursing program," the Court stated that § 504 does not "compel Southeastern to undertake affirmative action." 442 U.S. 407, 409, 99 S.Ct. 2367, 2368. Rather "the language and structure" of the Act "reflect a recognition by Congress of the distinction between the evenhanded treatment of qualified handicapped persons

and affirmative efforts to overcome the disabilities caused by handicaps." 442 U.S. at 410, 99 S.Ct. at 2369.[1] It is precisely this distinction between evenhanded treatment by the state and equality of results that my colleagues fail to recognize.

## II.

It is highly questionable whether a disparate impact test should be applied under § 504. This case appears to be the first federal appellate court opinion which actually finds discrimination against the handicapped by applying a "disparate impact" test. *The Medical Center* found no *prima facie* case, even assuming the applicability of such a test. My research discloses no other appellate case that suggests that such a test is applicable under section 504, and there is now substantial doubt that the test is applicable under Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d (1976), the provision the majority points to as the analogue for § 504. *See Cannon v. University of Chicago,* 648 F.2d 1104, 1106–09 (7th Cir.1981) (disproportionate impact does not establish a Title VI violation; discriminatory intent required); *Guardians Ass'n of New York v. Civil Service Comm'n of the City of New York,* 633 F.2d 232, 254, 272–75 (2d Cir.1980) (same). The unsatisfactory nature of the disparate impact test is intelligently discussed in Eisenberg, *Disparate Impact,* 52 N.Y.U.L.Rev. 36 (1977), an article which proposes a better test of causation in discrimination cases.

Assuming *arguendo* the applicability of a disparate impact test, this case illustrates why such a test will not work unless a bright-line equality of access standard is used. Combining an equality of results standard with a disparate impact test means the plaintiff always wins.

According to the majority's interpretation of the statute, a plausible interpretation in light of the broad language of the statute, there are many sub-classes of patients who fall within the "handicapped" category, not just traditional groups like the blind, the deaf and the lame. The majority's list would seem to include any serious, limiting physical or mental ailment, from asthma and arthritis to alcoholism and drug addiction. Any reduction in funding or services will have a differential impact on some class of patients. In such a situation the disparate impact test will always work for some class of illness; it will always produce a finding of discrimination. The alternative solution suggested by the majority—a limitation based on the number of trips to the hospital during the year rather than the number of days—will fall hardest on the class of patients who must come often to the hospital for short stays. It is clear that the majority's alternative would also produce a finding of discrimination if its disparate impact analysis is carried to its logical conclusion.

There appears to be no way under the set of standards developed by the majority that a state can modify its medical program

1. The Court discussed and ruled on this distinction in the following two paragraphs:

The language and structure of the Rehabilitation Act of 1973 reflect a recognition by Congress of the distinction between the evenhanded treatment of qualified handicapped persons and affirmative efforts to overcome the disabilities caused by handicaps. Section 501(b), governing the employment of handicapped individuals by the Federal Government, requires each federal agency to submit "an affirmative action program plan for the hiring, placement, and advancement of handicapped individuals...." These plans "shall include a description of the extent to which and methods whereby the special needs of handicapped employees are being met." Similarly, § 503(a), governing hiring by federal contractors, requires employers to "take

affirmative action to employ and advance in employment qualified handicapped individuals...." The President is required to promulgate regulations to enforce this section.

Under § 501(c) of the Act, by contrast, state agencies such as Southeastern are only "encourage[d] ... to adopt and implement such policies and procedures." Section 504 does not refer at all to affirmative action, and except as it applies to federal employers it does not provide for implementation by administrative action. A comparison of these provisions demonstrates that Congress understood accommodation of the needs of handicapped individuals may require affirmative action and knew how to provide for it in those instances where it wished to do so. 442 U.S. 410–11, 99 S.Ct. 2369.

without some disparate impact on some class of patients—unless the state simply abolishes Medicaid altogether, a solution that would presumably be equal only because it denies relief to everyone. Obviously, neither the majority nor I want to encourage that kind of nihilistic solution, which requires that everyone should fail so that no one will succeed more than another—the ultimate in equality of results.

For these reasons, I respectfully but strongly disagree with the majority and would affirm the judgment of the District Court.